UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


GWENNETTE WILSON,         )
                                       )
      Plaintiff,         )
                                       )
v.                                  )     Cause No. 4:11-CV-00790- RWS
                                       )
ST. CHARLES COUNTY,      )
DEPUTY MATT HOWZE, Individually )
and as Deputy Sheriff of St. Charles   )
County, and TASER          )
INTERNATIONAL, INC.,        )
                                       )
      Defendants.       )
                                       )
_____)


**PLAINTIFF'S RESPONSE & MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT TASER INTENTIONAL, INC.'S
MOTION FOR SUMMARY JUDGMENT**


      COMES NOW Plaintiff, GWENNETTE WILSON, by and through her attorneys, and

pursuant to Federal Rule of Civil Procedure 56, respectfully requests that this Honorable

Court enter an order denying Defendant TASER's motion for summary judgment [Doc. #73].

In opposition, Plaintiff states the following:

      1.     This case arises from the death of Plaintiff's son, James Wilson, on May 6,

2008.  James suffered cardiac arrest and died shortly after St. Charles County Deputy Sheriff

Matthew Howze fired two darts into his chest near his heart from a Model X26 electrical

control device ("ECD") manufactured by Defendant TASER International, Inc. (hereafter, "TASER"). The electrical current passing between the darts caused Robert's heart to go into ventricular fibrillation (VF), the lethal arrhythmia associated with external electrical interference with the heart's natural sinus rhythm, and paramedics were unable to resuscitate him.

2. TASER is the only defendant remaining. Plaintiff resolved her claims against St. Charles County, and thereby withdrew her allegations of wrongful conduct against the St. Charles County Sheriff's Department (SCCSD) and various SCCSD deputies, including Deputy Matthew Howze, by stipulating to a dismissal with prejudice – without admission of fault by those defendants.

3. Plaintiff, in her Complaint, [Doc. #1], alleges three wrongful death claims against TASER: (I) strict products liability (design defect) (II) strict products liability (failure to warn), and (III) negligence (failure to warn).

4. Genuine issues of material fact preclude summary judgment on each count. *See* Fed. R. Civ. P. 56(a).

5. Along with its sales and distribution of the X26, TASER provides extensive X26 training and training resources to customers such as the SCCSD. This activity gives rise to a duty on the part of TASER to exercise due care in so doing. Law enforcement and correctional agencies who purchase X26's from TASER, either directly or through a distributor such as Ed. Roehr Safety Products, are informed by TASER to send the agencies' training officers to regional schools held by TASER's "master instructors," where TASER

certifies those agencies' training officers as instructors to certify users.

6.     TASER training materials, updated regularly, are used throughout the training process. TASER regularly issues, revises and updates comprehensive training versions for instructors and users, as well as training bulletins, product warnings and operating manuals. Customer agencies such as the SCCSD rely *exclusively* on TASER to provide them accurate and timely information on the safe and effective use of the X26.

7.     TASER became aware, prior to May, 2005, through scientific research funded by the company, that X26 darts fired into the chest near the heart increase the risk of cardiac arrest and, therefore, should be avoided. These findings were replicated by two independent research groups. Prior to James Wilson's death, there had been six peer-reviewed scientific articles reporting that X26 discharges near the heart increase the risk of cardiac arrest. Nevertheless, TASER, acting deliberately, with gross negligence and in conscious disregard for this known risk, continued to train, through its master instructors and training materials, that users should aim the X26 "like a firearm" at "center of mass," and that scientific animal testing had established the X26's cardiac safety "even in worse case scenarios" – meaning that it was safe to deploy TASER darts near the heart.

8.     The SCCSD took delivery of its first X26's on April, 20, 2005, and, sometime later in 2005 sent SCCSD Deputy Jeremy Thom to a TASER sponsored eight-hour training program based on TASER Training Version 12.[1]  Subsequent to his initial TASER training,

_____

[1]  Deputy Thom could not recall the specific training version that was used to train him. However, TASER's Training Version 12 was released on January 1, 2005 and remained in effect until April 30, 2006 when it was superceded by the release of Version 13 on May 1, 2006.  Since TASER mandates that its training instructors use the most up-to-date training version at the time, it can be presumed that in 2005, Deputy Thom was trained with Version 12.

Deputy Thom was sent to TASER's corporate headquarters in Scottsdale, AZ where he received more advanced TASER training from TASER employees completing an "Instructor" course and a "Armorer" class. As a result of this training, Deputy Thom become a "certified instructor" specifically authorized by TASER to train and "certify" individual officers such as SCCSD Deputy Howze as X26 users. Consistent with that training, Deputy Howze was taught to aim the X26 "like a firearm" at "center of mass," and that shots to the chest had been proven cardiac safe in animal studies. TASER knew that the latter representation was false. Deputy Howze aimed his X26 exactly as he was trained to do.

9.     Barry Thornell, an eyewitness to the incident, observed Deputy Howze and Wilson for approximately ten seconds during which Howze and Wilson stood motionless about 6 feet apart at the rear of the Wilson vehicle. According to Mr. Thornell, Wilson did not advance on Deputy Howze during that time. As the two men stood facing each other at a distance of about 6 feet, Howze had sufficient time to aim his X26 at James Wilson's chest, "painting" it with a red dot from the device's laser targeting. He had sufficient time to observe the red laser dot on Wilson's chest. Rather than being the "rapidly evolving" situation that he claims, Deputy Howze had ample time to deliberate and purposefully aim his X26 at Wilson's chest. Accordingly, Plaintiff has evidence establishing genuine issues of fact on all elements of all five counts alleged.

10.     Throughout its moving papers, TASER fails "to adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572

U.S. , slip. op. at 1 (May 4, 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  TASER cites various fragments of testimony and law, and draws inferences, arguing that they support findings in its favor. TASER does not, however, meet the Rule 56(a) burden of demonstrating that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

11.     Genuine issues of material fact preclude summary judgment on the issue of "warnings causation" where TASER master instructors trained and certified SCCSD instructors who, pursuant to that training and TASER training materials, instructed SCCSD Deputy Howze to "aim like a firearm" at "center mass," and neither instructed nor warned that darts in the chest, near the heart, increase the risk of cardiac arrest.  Deputy Howze fired his X26 exactly as TASER directed.

12.     Genuine issues of material fact preclude summary judgment on whether TASER had a duty to warn that darts in the chest, near the heart, increase the risk of cardiac arrest when TASER's own researchers so stated.  Their findings were replicated by two independent research groups, and those results were published in six peer reviewed publications before James Wilson's death.

13.     Genuine issues of material fact preclude summary judgment on whether TASER was grossly negligent in continuing to train that the X26 should be aimed "like a firearm" at "center mass," and was cardiac safe, after its own researchers determined that darts in the chest, near the heart, increase the risk of cardiac arrest, and their findings were replicated by two independent research groups and published in six peer-reviewed

publications before James Wilson's death.

WHEREFORE, for the reasons stated above and in Plaintiff's Brief in Opposition which follows, the Court should enter an order denying Defendant TASER's motion for summary judgment in all its particulars.

DATED: July 16, 2014                Respectfully submitted,

*WILLIAMSON LAW FIRM*
*DEVEREAUX, STOKES, NOLAN,*
*FERNANDEZ & LEONARD, P.C.*


  /s/   PETER M. WILLIAMSON
*PETER M. WILLIAMSON, Pro Hac Counsel*
*Attorneys for Plaintiff*
*20750 Ventura Blvd., Suite 345*
*Woodland Hills, CA 91364*
*Email: pmw@pwilliamsonlaw.com*
*Tel:  (818) 226-5700*
*Fax:  (818) 226-5704*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| GWENNETTE WILSON, | ) | |
| | ) | Cause No. 4:11-CV-00790- RWS |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **PLAINTIFF'S MEMORANDUM OF** |
| ST. CHARLES COUNTY, | ) | **LAW IN OPPOSITION TO** |
| DEPUTY MATT HOWZE, Individually | ) | **DEFENDANT TASER** |
| and as Deputy Sheriff of St. Charles | ) | **INTENTIONAL, INC'S MOTION** |
| County, and TASER | ) | **FOR SUMMARY JUDGMENT** |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

COMES NOW Plaintiff, GWENNETTE WILSON, by and through her attorneys, and

submits the following Memorandum of Law in Opposition to Defendant TASER,

International, Inc.'s Motion for Summary Judgment.

DATED: July 16, 2014                    Respectfully submitted,

                                        *WILLIAMSON LAW FIRM*
                                        *DEVEREAUX, STOKES, NOLAN,*
                                        *FERNANDEZ & LEONARD, P.C.*


                                         /s/   PETER M. WILLIAMSON
                                        *PETER M. WILLIAMSON, Pro Hac Counsel*
                                        *Attorneys for Plaintiff*
                                        *20750 Ventura Blvd., Suite 345*
                                        *Woodland Hills, CA 91364*
                                        *Email: pmw@pwilliamsonlaw.com*
                                        *Tel:  (818) 226-5700*
                                        *Fax:  (818) 226-5704*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -ii-

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.    The Model X26 and TASER's Training Program . . . . . . . . . . . . . . . . 3

        B.    TASER's Own Research in Early 2005 Disclosed the Increased
            Cardiac Risk from Chest Shots . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        C.    The SCCSD Purchased X26s and Trained Pursuant to TASER's
            Training Protocols. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        D.    The Death of James Wilson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III.   TRIABLE ISSUES OF FACT EXIST WHICH PRECLUDE THE
      GRANTING OF SUMMARY JUDGMENT AS TO PLAINTIFF'S
      DESIGN DEFECT/FAILURE TO WARN CLAIMS . . . . . . . . . . . . . . . . . . . 17

IV.   PLAINTIFF IS ENTITLED TO A PRESUMPTION THAT HAD A
      PROPER WARNING BEEN GIVEN BY TASER ABOUT THE
      CARDIAC RISK OF CHEST SHOTS, DEPUTY HOWZE WOULD
      HAVE HEEDED IT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

V.    MISSOURI LAW DOES NOT REQUIRE EXPERT TESTIMONY IN
      PRODUCT DEFECT/FAILURE TO WARN CASES EXCEPT WHERE
      THE CLAIMS BEING ASSERTED ARE OUTSIDE THE COMMON
      KNOWLEDGE OR EXPERIENCE OF A JURY . . . . . . . . . . . . . . . . . . . . . 23

VI.   THE OPINION IN *BACHTEL* DOES NOT BAR PLAINTIFF'S DESIGN
      DEFECT/FAILURE TO WARN CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

VII.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3

*Arnold v. Ingersoll–Rand Co.,* 834 S.W.2d 192, 194 (Mo.1992) (en banc) . . . . . . . . . . . . . . . . . . . . . . . 21

*Bachtel v. TASER, Intern., Inc.* 747 F. 3d 965, 971 (8th Cir. 2014) . . . . . . . . . . . . . . 20, 21, 22, 23, 26, 27

*Belec v. Hayssen Mfg. Co.,* 105 F.3d 406, 408 (8th Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Boerner v. Brown & Williamson,* 260 F. 3d 837, 844-845 (8th Cir. 2001) . . . . . . . . . . . . . . . . . 21

*Campbell v. American Crane Corp.,* 60 F.3d 1329, 1331 (8th Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Dancy v. Hyster Company,* 127 F. 3d 649, 654 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Fontenot v. TASER International, Inc.,* 736 F.3d 318, 324-25 (4th Cir. 2013) . . . . . . . . . . . . . . . . 1, 3, 25

*Graham v. Connor,* 490 U.S. 386, 396 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Jaurequi v. John Deere Co.* (E.D. Mo. 1997) 971 F. Supp. 416, 427 aff'd sub nom,
*Jaurequi v. Carter Mfg. Co., Inc.* (8th Cir. 1999) 173 F.3d 1076 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Keener v. Dayton Elec. Mfg. Co.,* 445 S.W.2d 362, 364 (Mo.1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Linegar v. Armour of Am., Inc.,* 909 F.2d 1150, 1153 (8th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Lindsay v. McDonnell Douglas Aircraft Corp.,* 460 F. 2d 631, 639 (14) (8th Cir. 1972) . . . . . . . . . . . . 25

*McIntyre v. Everest & Jennings, Inc.,* 575 F.2d 155, 157 (8th Cir.), *cert. denied,*
439 U.S. 864, 99 S. Ct. 187, 58 L. Ed.2d 173 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Mouser v. Caterpillar, Inc.* (E.D. Mo., Oct. 6, 2000, 498CV744 FRB) 2000 WL 35552637 . . . . . . . 17

*Moslander v. Dayton Tire and Rubber Co.,* 628 S. W. 2d 899, 904 (Mo. Ct. App. 1981) . . . . . . . . . . . 25

*Nesselrode v. Executive Beechcraft, Inc.,* 707 S. W. 2d 371, 382, 385 (Mo. 1986) . . . . . . . . . . 23, 24, 27

*Patterson v. Foster Forbes Glass Co.,* 674 S. W. 2d 599, 604 (Mo. Ct. App. 1984) . . . . . . . . . . . . . . . . 25

*Pree v. Brunswick Corp.* (8th Cir. 1993) 983 F.2d 863, 865 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Racer v. Utterman* (Mo. Ct. App. 1981) 629 S.W.2d 387, 394 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Russell ex rel. Russell v. Wright,* 916 F. Supp. 2d 629 (W.D. Va. 2013) . . . . . . . . . . . . . . . . . . . . . . . 4

*Smith v. Brown & Williamson Tobacco Corp.,* 275 S.W.3d 748, 786 (Mo. Ct. App.2008) . . . . . . . . 21, 22

# TABLE OF AUTHORITIES (conti.)

## Cases

*Tenbarge v. Ames Taping Tool Sys., Inc.,* 190 F.3d 862, 866 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . 20, 21

*Tolan v. Cotton*, 572 U.S., slip. op. at 1 (May 4, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

*Williams v. Ford Motor Co.*, 411 S. W. 2d 443, 447 (3) (Mo. Ct. App. 1966) . . . . . . . . . . . . . . . . . . . 25

*Winters v. Sears, Roebuck and Co.*, 554 S. W. 2d 565, 569 (Mo. Ct. App. 1977) . . . . . . . . . . . . . . . . . 25

## Misc.

Restatement (Second) of Torts section 402A (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## I.     INTRODUCTION

On   May 6, 2008, Plaintiff's son, 22-year-old James Wilson, experienced cardiac arrest shortly after St. Charles County Sheriff's Department ("SCCSD") Deputy Matthew Howze fired electrified darts into his chest from a Model X26 manufactured by Defendant TASER International, Inc. ("TASER").  Paramedics found James in ventricular fibrillation (VF), the lethal arrhythmia associated with electrical interference with heart rhythm. Efforts to resuscitate James failed.

Plaintiff's claims against TASER track those of another plaintiff-mother, whose 17-year-old son, Darryl Turner, died after being shocked in the chest by an X26 on March 20, 2008, in Charlotte, North Carolina. Upholding the jury's negligence verdict, the Fourth Circuit explained that although both TASER's own study, as well as an independent study, had established that X26 "electrical pulses can 'capture' cardiac rhythms, potentially leading to ventricular fibrillation," and that "if users avoided striking the subject's chest area with the taser's darts, the risk of ventricular fibrillation would be reduced significantly," TASER "did not alter its training materials so as to warn users of the X26 taser that shots to a person's chest could result in ventricular fibrillation, or that taser use near the heart should be avoided." *Fontenot v. TASER International, Inc.*, 736 F.3d 318, 324-25 (4th Cir. 2013).

Plaintiff's liability theory here is the same as *Fontenot* – except much stronger because TASER had actual notice of Darryl Turner's death for almost two months before James Wilson was shot in the chest by Deputy Howze and suffered the same fate.

This motion should be denied because TASER's papers do not "adhere to the axiom

that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. , slip. op. at 1 (May 4, 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). TASER, instead, seeks to shift focus from its own wrongful conduct to Deputy Howze, who used the X26 exactly as he was trained and instructed – aimed at the chest – and who now must live with the memory of having inadvertently killed a young man. Incredibly, TASER relies on a contrived, attorney influenced declaration from Deputy Howze which speculates that even if he had been properly trained about the cardiac risks of chest shots, he would have ignored such training, acted insubordinately, and fired his X26 at James' chest regardless. This assertion by Deputy Howze lacks credibility (a jury question) and is objectionable on the grounds that is nothing more than rank speculation. On the other hand, the undisputed facts establish that Deputy Howze followed his training precisely – the targeting of his X26 at James Wilson's chest was consistent with and foreseeable based on the training he received.

Furthermore, TASER goes to considerable lengths in arguing the "speculative theoretical" risk of cardiac arrest due to chest shots while at the same time conceding that "fact disputes prevent summary judgment on that ground." [Dckt. 73, p. 2] More importantly, TASER completely ignores the deposition testimony of Patrick J. Tchou, M.D., TASER's own research electrophysiologist (a cardiologist certified in the sub-specialty of the heart's electrical rhythm), who recounted how he warned TASER, including its CEO and the head of its Medical and Science Advisory Board, prior to the time SCCSD first began

purchasing X26s that X26 electrical current near the heart increases the risk of cardiac arrest.

There is substantial evidence "from which a reasonable jury could return a verdict" in Plaintiff's favor as a previous jury did based on similar facts (*Fontenot*). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, TASER's motion for summary judgment should be denied.

## II. STATEMENT OF FACTS

### A. The Model X26 and TASER's Training Program

The TASER Model X26, first introduced in 2003, fires two half-inch darts, one above the other, connected to wires attached to a cartridge mounted on the device. There is a laser sight that projects to the impact point of the top dart. [Ex. "B" (diagram of X26)]

Pulling the trigger fires the darts and discharges a five-second "cycle" of electricity, pulsing 19 times a second, that radiates through the tissue between the darts.[2] Each pulse peaks at 3 to 5 amps, causing muscle contractions intended to disable the person. [Ex. "A", Leonesio Dec., ¶ 5] The X26 current is powerful. Besides causing cardiac arrest, [Ex. "C" (case reports on 8 subjects)], X26 current has fractured vertebrae in a police volunteer, [Ex. "D" (case report)], and triggered a seizure in an officer shocked in the head by mistake during a field situation. [Ex. "E" (case report)]

TASER sells the X26 to law enforcement and correctional agencies, directly or through distributors such as Ed. Roehr Safety Products, with instructions that the customer agencies train their officers pursuant to TASER training. TASER employs "senior master

---

[2] Although not relevant to Wilson's death, exposures can be prolonged by holding the trigger longer than five seconds, and cycles can be repeated by pulling the trigger again after a cycle ends. Ex. "A", Leonesio Dec., ¶ 5]

instructors" to train and certify its cadre of "master instructors," generally off-duty officers. TASER pays the master instructors to hold "schools" where they train and certify training officers from customer agencies. These agency trainers become "certified instructors," tasked with training and certifying individual officers in the proper use of the X26. [Ex. "A", Leonesio Dec., ¶ 7]

For use throughout the training process, TASER issues comprehensive "training versions," revised roughly every year or two, consisting of slides and videos, along with forms, tests, lesson plans, warnings, and other documents. Training Versions 12, 13 and 14, which are very similar, were in use during the time relevant to this case. [Ex. "A", Leonesio Dec., ¶ 6 (TASER is currently using Training Version 19)]

TASER frequently issues "training bulletins" covering various issues, fifteen alone during 2007 and 2008. TASER directs instructors to check the TASER.COM website within 72 hours of each class so the latest training materials are used. [Ex. "A", Leonesio Dec., ¶ 11] TASER conveys instructions and warnings through this training protocol, rather than traditional packaging and product manuals *See Russell ex rel. Russell v. Wright*, 916 F. Supp. 2d 629, 646 (W.D. Va. 2013).

Prior to James Wilson's death TASER never instructed or warned that X26 darts fired into the chest, where the current flows close to the heart, increase the risk of cardiac arrest; instead, TASER instructed that the X26 be fired "like a firearm" at "center of mass" and that showed there was no cardiac risk from chest shots. [Ex. "A", Leonesio Dec., ¶ 12] The Version 12 user course PowerPoint, for example, instructs: "Aim like a standard firearm

at center of mass," [Ex. "F" (Slides 66 and 80)], "Extensive animal testing has shown effect on heart rhythms or blood pressure to be insignificant," [Ex. "G" (Slide 32)], and "Using 'worst case' scenarios [chest shots], cardiac safety experts found no induction . . . of abnormal heart rhythms," [Ex. "H" (Slide 34), although, as explained below, TASER's research had already demonstrated these statements to be blatantly false.

B.     TASER's Own Research in Early 2005 Disclosed the Increased Cardiac Risk from Chest Shots

TASER retained Patrick J. Tchou, M.D., a leading cardiac electrophysiologist at the prestigious Cleveland Medical Clinic, to supervise state-of-the art testing of X26 cardiac safety. [Ex. "I", Tchou Dep. 6:25; 7:1-23 (*Fahy*)] Dr. Tchou designed a study, which TASER approved and funded, resulting in two peer-reviewed articles reporting that X26 current near the heart affects cardiac rhythm, and cautioning that chest shots should be avoided to reduce the risk of "ventricular arrhythmias." [Ex. "I", Tchou Dep. 10:18-25 (*Fahy*); 11:1-3; Ex. "J" (first Tchou article); Ex. "K"(second Tchou article)]

By inserting a recording catheter into a pig's heart, [Ex. "I", Tchou Dep. 16:14-25; 17:1-17 (*Fahy*)], Dr. Tchou detected that standard X26 discharges to the chest "captured" the heart rhythm, causing it to beat 200 to 300 times a minute, which "potentially can cause arrhythmias," the first time this lethal risk was documented. [Ex. "J"]  This research was conducted in early 2005 in the presence of TASER engineers who witnessed the test results (X26 was causing cardiac capture) while the tests were being performed.[3]  [Ex. "L", Tchou

---

[3]  Pre-dating the meeting between Dr. Tchou and TASER representatives which occurred prior to the May, 2005 Heart Rhythm Society Meeting.

dep. 71:4-23 (*Mitchell*)]

Subsequently, Dr. Tchou and his co-researcher, Dr. Lakkireddy, presented the results of their TASER-funded study to representatives of TASER at the Cleveland Clinic *two to four months* after their testing was completed but prior to a Heart Rhythm Society meeting which was held on May 4-7, 2005 in New Orleans. [Ex. "I", Tchou Dep. 88:20-25; 89:1 (*Fahy*)][Ex. "L", Tchou dep. 72:22-25; 73:1 (*Mitchell*)] Attending the meeting were Dr. Mark Kroll, head of TASER's Science and Medical Advisory Board and Patrick Smith, President and CEO of TASER. [Ex. "L", Tchou dep. 73:2-24 (*Mitchell*)] During that meeting, Dr. Tchou warned that "because of our capture data, . . . there is some possibility that this could induce ventricular arrhythmias in people," and it "was very clear" that darts farther from the chest or heart are safer. [Ex. "L", Tchou Dep. 77:5-25, 92:25; 93:1-25; 94:1-16 (*Mitchell*); Ex. "I", Tchou Dep. 90:1-23 (*Fahy*)]

Dr. Tchou told TASER that cardiac arrest can occur when at least one dart lands in "the chest close to the heart" and "it would be highly unlikely to have any directly induced arrhythmias from a TASER dart to … parts of the body other than near the heart." [Ex. "L", Tchou Dep. 82:5-25; 83:1-4 (*Mitchell*); *accord*, Ex. "I", Tchou Dep. 60:7-17 (*Fahy*) ("that would be pretty obvious")]

Dr. Tchou and Dr. Lakkireddy published their study in the prestigious, peer-reviewed *Journal of the American College of Cardiology* during the summer 2006 calling it "the first to describe capture of ventricular myocardium during application of [X26] pulses," and added that "avoidance" of darts near the heart "would greatly reduce any concern for

induction of ventricular arrhythmias." [Ex. "J" at 810-811] Although the results were necessarily from test animals, the authors noted that the results could be "generalized to humans." *Id.*

In the same volume of the *Journal of American College of Cardiology*, Kumaraswamy Nanthakumar, M.D., also a leading cardiac electrophysiologist, reported the results of his group's independent X26 study. It too found a tight correlation between X26 darts close to the heart and high-rate cardiac capture, actually inducing ventricular tachycardia in one subject and ventricular fibrillation in another. [Ex. "M"]

These dramatic findings appeared in print nearly two years before James Wilson died. Dr. Tchou's explicit warnings, however, "did not impact [TASER] training," according to TASER CEO Patrick ("Rick") Smith. [Ex. "N", Smith Dep. 13:17-25; 14:1-25; 15:1-25; 16:1-24; 17:19-25; 18:1-11; 22:1-25; 23:1-4 (*Butler*)]  The results of Dr. Tchou's research and the caution he expressed to Dr. Kroll and Mr. Smith were not even passed on to members of TASER's Science and Medical Advisory Board ("SMAB") [Ex. "O", Luceri Dep., Vol. II,  137:5:25; 138:1-21; 139:15-25; 140:1-3] nor to Rick Guilbault, the TASER executive in charge of training. [Ex. "P", Guilbault Dep. 63:7-25; 64:1-13 (*Butler*)]

TASER General Counsel Doug Klint confirms that prior to a March 20, 2008, TASER had not warned it users that applying dart mode to the chest of a human being could potentially cause a cardiac arrest.  [Ex. "Q", Klint Dep. 73:12-23 (*Fontenot*)]   In fact, prior to the issuance of a September 20, 2009 training bulletin – issued more than sixteen (16) months after James Wilson's death  – TASER did not warn that darts to the chest could cause

cardiac arrest. [Ex. "A", Leonesio Dec., ¶ 13]. [4]

Indeed, TASER never even informed its master instructors that darts to the chest affected cardiac rhythms. [Ex. "A", Leonesio Dec., ¶ 13]  Deputy Thom, the SCCSD TASER training instructor, used TASER's training Powerpoints to teach SCCSD deputies that ECDs applied directly to the chest of experimental animals did not cause heart failure during tests at the University of Missouri. [Ex. "R", Thom Dep. p. 74:5-10; 76:13-24; 77:1-7]    Instead, TASER's Versions 12, 13 and 14 Instructor PowerPoints, [Ex. "S" (Ver. 13, Slide18), Ex. "T" (User Ver. 14, Slide 14)], as well as its 2007 X26 Operating Manual, [Ex. "U"] (like the 2005 Manual shipped with SCCSD's X26s, [Ex. "V")], illustrated proper X26 use as follows:



C.    The SCCSD Purchased X26s and Trained Pursuant to
      TASER's Training Protocols.

Ed. Roeher Safety Products, a distributor of TASER weapons, shipped 25 Model X26

---

[4] This TASER training bulletin, issued sixteen months post-incident, states: "Conclusion regarding the potential for cardiac effects: Researchers have been able to demonstrate changes in heart rate and rhythm consistent with cardiac pacing and, in some cases, ventricular fibrillation (VF) in small swine, an arrhythmia that can be fatal without intervention, and have concluded that a close distance between the ECD dart and the heart is the primary factor in determining whether an ECD will affect the heart. . . . In order to increase the safety margin . . . users should aim for the back or (when practical) toward the mid lower abdomen and avoid intentionally targeting the chest area. [Ex. "AA"]

ECDs, including the one used in this incident, to the SCCSD on April 20, 2005. [Ex. "W"] The ECDs were accompanied by TASER's Training Version 12 and a 2005 Operating Manual. [Ex. "V"]

Subsequent to purchasing its X26s, the SCCSD sent Deputy Jeremy Thom to an eight hour X26 user certification course that included a classroom portion with a PowerPoint presentation, a hands-on portion and a voluntary exposure to the device. [Ex. "R", Thom Dep. p. 17:16-24, 18:1-4] Subsequently, Deputy Thom attended instructor and armorer classes at TASER's corporate headquarters in Scottsdale, Arizona [*Id.* at p. 18:9-13]. All of Deputy Thom's training instructors in Scottsdale were TASER employees. [*Id.* at p. 19:7-13]

At the time that Deputy Howze was initially trained to use an X26 in December 2005, Deputy Thom was one of the lead TASER training instructors for the SCCSD and was present at all of the initial training classes. [*Id.* at p. 33:19-24; 34:1-9] The Version 12 X26 Instructor's Course included multiple instructions to aim the X26 at the chest, precisely where Dr. Tchou had told TASER the cardiac risk is highest: Slide79 ("Aim like a standard firearm at center of mass."), Slide 93 ("Aim at target: Center of mass or legs"), and Slide 95 (Effective Target Zones). [Ex. "EE"] Deputy Thom was trained to target "center mass" because such a target has the "highest probability of a successful hit . . . ." [Ex. "R", Thom Dep. 64:1-6, 17-24]

The X26 Version 12 TASER instructor course assured Deputy Thom that there would be no adverse cardiac effects, even with darts near the heart. [Ex. "EE", slide 37 (TASER Technology Medical Safety – "Extensive animal testing has shown effect on heart rhythms

or blood pressure to be insignificant."); slide 39 (Medical Safety: Drugs – "The ADVANCED TASER M26 was applied directly to the chest of experimental animals without causing heart failure during tests at the University of Missouri. Using "worst case" scenarios, cardiac safety experts found no induction by the M26 weapon of abnormal heart rhythms. No arrhythmia provocation occurred even when the animals were given the stimulant drugs epinephrine and isoproternol, agents that make the heart more susceptible to electrical stimulation.") [5]

In early 2005, however, Dr. Tchou's tests raised his "concern that a rapid pacing of the heart can potentially generate heart arrhythmias." [Ex. "L", Tchou Dep. 89:12-18 (*Mitchell*)] Ignoring Dr. Tchou's explicit concerns, TASER failed to inform or warn the SCCSD instructors that shots to the chest increased the risk of cardiac arrest. Deputy Thom trained SCCSD officers using "a CD-ROM that was given to us by the company [TASER] that contained the current training version . . ." as well as "updates by the company, training updates . . ." [Ex. "R", Thom Dep. p. 35:9-24] Deputy Thom personally checked TASER's website to look for updates and would disseminate the information contained in any updates he saw to all SCCSD deputies including the deputies that were participating at that time in TASER training. [*Id.* p. 36:1-16] Deputy Thom reviewed all updated warnings as well. [*Id.* p. 36:17-21] Deputy Thom instructed SCCSD deputies including, Deputy Howze, that the X26 was a "non-lethal" weapon [*Id.* p. 43:23-24; 44:1-5] and that it should be "aimed like a standard firearm at center of mass." [*Id.* p. 99:6-21] [Ex. "F"]

_____

[5] Although these slides refer to the M26, it is important to emphasize that they were placed in an X26 Instructor training PowerPoint which suggests that the representations were meant to apply to the X26 as well.

Deputy Howze's initial TASER X26 training consisted of an eight hour class. [Ex. "X", Howze dep. 16:1-25]  As part of this training, Deputy Howze viewed a PowerPoint presentation (Version 12), watched videos, engaged in hands-on simulations, discharged an X26 and received a 5-second deployment from the device. [*Id.* 17:1-15]

On December 5, 2006, Deputy Howze received an additional three hours of TASER training (TASER Training Version 13) and was re-certified to use the weapon.  [*Id.* 17:24-25, 18:1-4] Version 13 includes a PowerPoint presentation which was used to retrain Deputy Howze.  On January 8, 2008, less than six-months prior to James Wilson's death, Deputy Howze was re-certified again as an X26 user undergoing a four hour class (Version 14). [*Id.* 18:13-25]  The Version 14 PowerPoint presentation was used to retrain Deputy Howze.

Deputy Thom and the TASER materials used to train Deputy Howze, instructed him to aim at "center mass" [Ex. "X", Howze dep. p. 75:13-24; 77:20-25].  TASER provided a "Certification Test" with Versions 12 and 13 which Deputy Howze was required to pass in order to be re-certified as an X26 user. [*Id.* 18:9-12] The written tests included the following:

1. When deploying probes, the TASER should generally be aimed at:
   A. Face
   B. Center of body mass
   C. The throat
   D. The head

TASER specified the *correct* answer to this question as "B.  Center of body mass".

24. The TASER X/M26 EMD Weapons affect the:
   A. Motor nervous system only
   B. Sensory nervous system only
   C. Sensory and motor nervous systems
   D. Cardiac system

TASER specified the *correct* answer to this question as "C. Sensory and motor nervous systems". The *incorrect* answer to this question is that the X26 affects the "Cardiac system." [Exs. "Y" and "Z"] [See also; Ex. "X", Howze dep. p. 189:1-20]

Deputy Howze followed his TASER training when he aimed his X26 at James Wilson's chest. [Ex. "X", Howze dep. 41:11-15 (". . . . by the time I had transitioned, and once my taser had cleared its holster, I said stop. And when he didn't *I made sure the laser site was center mass and I pulled the trigger*.")(emphasis added); See also: pp. 48:19-25; 49:1-4; 75:13-24; 77:20-25; 78:1-6; 114:20-25; 115:1, 21-25; 116:1-7] Based on his initial TASER training, and his subsequent re-certification training, Deputy Howze believed that the cardiac risks of firing probes into a subject's chest "were negligible." "There was little to no effect on cardiac systems." [*Id.* 191:1-11] He was taught that an X26 should not effect a "normal healthy" individual's heart. [*Id.* 191:21-24] He did not recall receiving any information during his training about an increased risk or adverse cardiac effects if the chest was targeted. [*Id.* 191:9-24] In fact, Deputy Howze did not believe, at the time he encountered James Wilson, that there were *any* risks associated with firing probes from an X26 into the chest of an individual. [*Id.* 192:2-7] Finally, Deputy Howze did not believe, at the time of this incident, that there was an increased risk of causing adverse cardiac effects to James Wilson if he targeted Wilson's chest. [*Id.* 192:25; 193:1-5]

## D. The Death of James Wilson [6]

James Wilson lived with his mother in Alton, Illinois. James was 22-years old at the

---

[6] For a more thorough and detailed statement of facts concerning the underlying incident, please refer to Plaintiff's Memorandum in Support of her Motion for Partial Summary Judgment [Dckt. 68].

time of his death and relatively slim in build – 5'10" and 145 pounds at autopsy. [Ex. "FF", Autopsy Report]

The parties agree that on May 6, 2008, at about 9:13 p.m., a call was received by the St. Charles County Dispatch Center from the on-duty assistant manager of the Conoco gas station located 14010 Highway 67 N. in West Alton, Missouri. The caller reported a physical fight in progress between two parties, later identified as James and his sister Shannon Wilson. St. Charles County Deputies Matthew Howze and Robert Bell responded to the dispatched call. Deputy Howze was first to arrive on-scene at approximately 9:33 p.m. [Ex. "GG", Bell Dep. 70:4-14; 74:11-16]

When Deputy Howze arrived he observed a vehicle matching the description of the one described as being involved in the incident attempting to leave the scene. In the course of his initial contact with the passengers of the vehicle, James Wilson exited the vehicle and proceeded to the rear bumper area where Deputy Howze confronted him. [*Id.* 33:1-14]

Deputy Howze drew his department issued Glock pistol and held it at a low-ready position while he ordered James to the ground. According to Deputy Howze, James did not comply with this order, instead throwing "his hands out to his sides" and "yelling I'm the one you want." [*Id.* 33:1-17; 34:7-18]

Seeing James was unarmed, Deputy Howze transitioned from his Glock to his TASER Model X26 electronic control device ("ECD") as James slowly walked towards him. [*Id.* 36:12-17; 111:8-18] However, eyewitness Barry Thornell observed James and Deputy Howze at the rear of the Wilson vehicle for approximately ten seconds during which James

did not move towards Howze. [Ex. "BB", Thornell dep. 38:10-22]

Deputy Howze aimed his TASER Model X26 at James' chest as he was trained to do (using a laser pointer built into the X26). [*Id.* 41:1-16; 75:16-24; 77:20-25; 78:2-6; 114:20-25; 115:1, 21-25; 116:1-7]  According to Deputy Howze, when James again refused to get on the ground, Howze deployed his TASER, striking James in the chest with two darts. The darts embedded themselves directly into James' chest area in the vicinity of his heart, approximately 4.2 inches apart.  [Ex. "HH", Autopsy Photo of James Wilson's chest]

At the end of the first TASER cycle, Deputy Howze reported James was still on his feet.  Deputy Howze claims he continued to order James to the ground and James continued to refuse.  Deputy Howze then delivered a second 5-second cycle of electrical charge four seconds after the end of the first cycle. [Ex. "II", X26 Dataport discharge log] [Ex. "X", 53:1-6, 22-25]

During the second cycle, Deputy Howze reported James fell against the back of the car and slid to the ground. [Ex. "X", 56:1-13; 60:14-16] Deputy Howze claims he then ordered James to lay on his stomach and place his hands behind his back. Deputy Howze claims James failed to comply. [*Id.* 60:8-19]  As a result, he delivered a third 5-second cycle of electrical charge, one second after the end of the second cycle.  [Ex. "II"][Ex. "X", 60:1-3, 23-25]   At the end of the third cycle, Howze reported that James complied with his order to lay on his stomach with his hands behind him. [Ex. "X", 61:4-10]

While still on the ground, Deputy Howze claims that James puts his right hand on the ground next to his shoulder and began to lift himself from the ground. Deputy Howze ordered

James to stay on the ground. [Ex. "X", 65:1-10] According to Deputy Howze, Wilson failed to comply at which time Howze delivered a fourth cycle of electrical stimulation two minutes and fifty-four seconds after the end of the third cycle. [Ex. "II"][Ex. "X", 65:11-15]

Following the fourth cycle, James was reported to be compliant. Deputy Howze claims that James spoke with him and moved his head, blowing dirt from around his face. [Ex. "X", 66:24-25; 67:1-5; 68:5-9] SCCSD Deputy Bell, the second deputy on scene, arrived at 9:36 p.m., three minutes after Howze arrived and handcuffed James who was found lying face down on the ground. [Ex. "GG", Bell dep. 74:13-16; 82:16-19; 86:18-20]

A review of the TASER dataport discharge log reveals that Deputy Howze delivered four 5-second cycles of electrical charge to James Wilson over a three minute and nineteen second period. [Ex. "II"]

After cuffing James, Deputy Bell was joined by Missouri Highway Patrol Corporal Broniec. [Ex. "GG", Bell dep. 88:6-13] Deputy Bell left James on the ground while he went to his patrol car to retrieve gloves with the intention of removing the TASER darts from James' chest. When Deputy Bell returned, he discovered James was unresponsive. Further examination revealed that James was pulseless and apneic. [Ex. "GG", Bell dep. 89:10-13; 95:5-8; 96:2-3; 98:1-14] Deputy Bell directed Corporal Broniec to remove James' handcuffs as he returned to his vehicle to get a CPR mask. Deputy Bell notified his dispatch of James' condition and requested EMS. Upon returning to James, Deputy Bell, along with Missouri State Troopers Boniec and Dinges, immediately began CPR. [Ex. "GG", Bell dep. 99:15-17; 101:11-12; 104:9-12; 112:11-13]

According to Deputy Bell, he estimated that he first noticed that James was limp, unresponsive and pulseless approximately 25 – 50 seconds after his arrival at the scene. [*Id.* 90:7-25; 91:3-24; 95:9-25; 96:1-3] Using the data downloaded from Howze' X26 discharge log, the total duration of the discharge sequence took 3:19 to complete. [Ex. "II"] Deputy Bell testified that based on his analysis of CAD dispatch logs, he arrived on scene precisely three minutes after Howze. Thus, Deputy Bell arrived on scene 19-seconds prior to the completion of the fourth and final TASER cycle. [Ex. "II"][Ex. "GG". Bell dep. 71:21-25; 72:1-10; 74:13-16] Relying on Deputy Bell's time estimates (i.e. walking from his car to James, completing the handcuffing process, walking back to his car, getting gloves out of his trunk and then returning to James, etc.), no more than 6 – 31 seconds elapsed from the completion of the fourth TASER cycle to Bell's first noticing that James was pulseless and unresponsive (subtracting 19 seconds from his 25 – 50 second estimate). [Ex. "II"] [Ex. "GG", Bell dep. 71:21-25; 72:1-10; 74:11-16] This fact is critically important because according to the testimony of TASER's expert electrophysiologist, Dr. Richard Luceri, the "primary" factor in establishing a causal connection between a TASER discharge and a cardiac arrest is the time interval between the discharge and the arrest. [Ex. "O", Luceri dep. 45:6-24] In other words, the shorter the time gap between a discharge and the onset of a cardiac arrest, the more likely the causal connection.

Various officers continued to perform CPR on James until EMS personnel arrived at the scene approximately ten minutes later. Upon their arrival, paramedics applied an automatic external defibrillator ("AED") to James's chest which recorded ventricular

fibrillation, an abnormal and chaotic heart rhythm in which the heart is incapable of perfusing blood to the organs of the body. [Ex. "JJ", Isgrigg dep. 45:3-10; 46:3-9] More importantly, ventricular fibrillation is the lethal arrhythmia most associated with an electrical injury.

Eventually, James was transported, by ambulance, to Christian Northeast Hospital. Unfortunately, all attempts to resuscitate James failed and he died a short time later.

## III. TRIABLE ISSUES OF FACT EXIST WHICH PRECLUDE THE GRANTING OF SUMMARY JUDGMENT AS TO PLAINTIFF'S DESIGN DEFECT/FAILURE TO WARN CLAIMS.

Under Missouri law, a plaintiff seeking to recover in strict liability for failure to warn must prove that: 1) TASER sold the X26 in the course of its business; 2) the product was unreasonably dangerous at the time of sale when used as reasonably anticipated without knowledge of its characteristics; 3) the defendant did not give an adequate warning of the danger; 4) the product was used in a manner reasonably anticipated; and 5) the plaintiff was damaged as a direct result of the product being sold without an adequate warning. [*Campbell v. American Crane Corp.,* 60 F.3d 1329, 1331 (8th Cir.1995)] "Unless a court can say as a matter of law that the product is not unreasonably dangerous the question is one for the jury." [*Mouser v. Caterpillar, Inc.* (E.D. Mo., Oct. 6, 2000, 498CV744 FRB) 2000 WL 35552637, *citing; Racer v. Utterman* (Mo. Ct. App. 1981) 629 S.W.2d 387, 394]

"[A] manufacturer can be held strictly liable for failure to warn of the dangers of a product even if there is no defect in its design." [*Belec v. Hayssen Mfg. Co.,* 105 F.3d 406, 408 (8th Cir.1997); *Jaurequi v. John Deere Co.* (E.D. Mo. 1997) 971 F. Supp. 416, 427 aff'd sub nom, *Jaurequi v. Carter Mfg. Co., Inc.* (8th Cir. 1999) 173 F.3d 1076]

The doctrine of strict liability in tort as set forth in the Restatement (Second) of Torts section 402A (1965) has been a part of the law in Missouri since its adoption in *Keener v. Dayton Elec. Mfg. Co.,* 445 S.W.2d 362, 364 (Mo.1969). [See also; *McIntyre v. Everest & Jennings, Inc.,* 575 F.2d 155, 157 (8th Cir.), *cert. denied,* 439 U.S. 864, 99 S. Ct. 187, 58 L. Ed.2d 173 (1978); *Pree v. Brunswick Corp.* (8th Cir. 1993) 983 F.2d 863, 865]

Comment h to Section 402A states in pertinent part:

Where [a manufacturer] *has reason to anticipate* that danger may result from a particular use, . . . [it] may be required to give adequate warning of the danger (see Comment *j*), and a product sold without such warning is in a defective condition. [emphasis added]

TASER argues that Missouri's state-of-the-art statute provides a complete affirmative defense in warnings cases where the "dangerous nature of the product was not known and could not reasonably be discovered at the time the product was placed into the stream of commerce." [Dckt. 73, p. 9-10].

Plaintiff submits that prior to the sale of X26s to the SCCSD on April 20, 2005, TASER had ample *reason to anticipate* that a danger (cardiac arythmias) may result when an X26 is deployed in a manner that TASER instructed i.e. to fire the X26 darts at a subject's chest. As previously described, Dr. Tchou, who was conducting research funded by TASER, met with TASER representatives prior to a Heart Rhythm Society Meeting that took place on May 4-7, 2005 in New Orleans. During that meeting, Dr. Tchou warned that "because of our capture data, . . . there is some possibility that this could induce ventricular arrhythmias in people," and it "was very clear" that darts farther from the chest or heart are safer. [Ex. "L", Tchou Dep. 77:5-25, 92:25; 93:1-25; 94:1-16 (*Mitchell*); Ex. "I", Tchou Dep.

90:1-23 (*Fahy*)] Two to four months prior to that meeting, TASER engineers were present while Dr. Tchou's tests were being performed and were aware of the test results. [Ex. "I", Tchou Dep. 88:20-25; 89:1 (*Fahy*)]

Dr. Tchou and his colleague, Dr. Lakkireddy, published the results of their study in the prestigious, peer-reviewed *Journal of the American College of Cardiology* during the summer 2006 calling it "the first to describe capture of ventricular myocardium during application of [X26] pulses," and added that "avoidance" of darts near the heart *"would greatly reduce any concern for induction of ventricular arrhythmias*." [Ex. "J" at 810-811] [emphasis added] Although the results were necessarily from test animals, the authors noted that the results could be "generalized to humans." *Id.*

Apart from Dr. Tchou's explicit warning about chest shots, on February 7, 2005, the U.S. Army Center for Health Promotion and Preventive Medicine issued a statement regarding the safety of TASER ECDs. The U. S. Army specifically addressed the question of whether TASER ECDs were "Safe to use on U.S. Army Military and Civilian Personnel during Training" [Ex. "KK"] and concluded:

- ". . . ventricular fibrillation can be induced by the electrical current." [*Id*. at 540]
- "Since 2001, many deaths have been linked to TASER use. Approximately 20 fatalities had documentation or proximity to the event at autopsy." [*Id*. at 540]
- "The Taser probably caused convulsions, ventricular fibrillation. elevated body temperature, and dramatic changes in blood flow and blood pressure." [*Id*. at 540-541]
- ". . . the incremental risk of adverse potential health effects to trainees is not justified." [*Id*. at 541]

Thus, the U.S. Army concluded that "The practice of using these weapons on U.S. Army military and civilian forces in training is *not recommended given the potential risks*." [*Id*. at 541][emphasis added]   This statement was issued more than two months prior to the sale of X26's to the SCCSD.   Yet, despite the U. S. Army's conclusion "that ventricular fibrillation can be induced by the [TASER's] electrical current" and that it was not recommended to be used on Army personnel because of its potential risks, TASER failed to warn about the cardiac risks.   And, despite Dr. Tchou's research findings and explicit warnings, which he gave directly to TASER executives, about the risk of inducing cardiac arythmias and avoiding chest shots, TASER again failed to warn users of its products such as Deputy Howze to avoid shooting darts into a subject's chest.   On this basis alone, a jury, like the one in *Fontenot*, could conclude that the TASER X26 was sold in a defective condition since TASER had *reason to anticipate* that danger may result from a particular use (chest shots) and failed to warn about the danger.   A trial on the merits is warranted on this issue.

## IV. PLAINTIFF IS ENTITLED TO A PRESUMPTION THAT HAD A PROPER WARNING BEEN GIVEN BY TASER ABOUT THE CARDIAC RISK OF CHEST SHOTS, DEPUTY HOWZE WOULD HAVE HEEDED IT.

"Under Missouri law, a rebuttable presumption that adequate warnings would have been heeded arises if the plaintiff shows that no warning was given." *Tenbarge v. Ames Taping Tool Sys., Inc.,* 190 F.3d 862, 866 (8th Cir. 1999) To establish a rebuttable presumption, the plaintiff must demonstrate that there is "legitimate jury question" as to whether Deputy Howze "knew of the specific danger that caused [Wilson's] injury." *Bachtel*

*v. TASER, Intern., Inc.* 747 F. 3d 965, 971 (8th Cir. 2014);  *Tenbarge v. Ames Taping Tool Sys., Inc., supra,* 190 F.3d at 866; See also: *Arnold v. Ingersoll–Rand Co.,* 834 S.W.2d 192, 194 (Mo.1992) (en banc)  Only "[i]f the defendant produces [rebuttal] evidence so strong that it would necessarily persuade any reasonable trier of fact that an adequate warning would have been futile" is the defendant "entitled to have causation determined as a matter of law." *Boerner v. Brown & Williamson Tobacco Corp.*, 260 F. 3d 837, 844-845 (8th Cir. 2001)

Here, the evidence is undisputed that: 1) no warning was ever given to Deputy Howze concerning the cardiac risks of X26 darts fired at the chest [Ex. "X", Howze dep. 191:9-24 – ". . . .cardiac risks were negligible.  There was little to no effect on cardiac systems."];  2) Deputy Howze did not believe, at the time he encountered James Wilson, that there were *any* risks associated with firing probes from an X26 into the chest of an individual. [*Id.* 192:2-7]; and 3) Deputy Howze did not believe, at the time of this incident, that there was an increased risk of causing adverse cardiac effects to James Wilson if he targeted Wilson's chest.  [*Id.* 192:25; 193:1-5]  The testimony of Deputy Howze is more than sufficient to raise the rebuttable presumption that no warning was ever given to him about the cardiac risks of chest shots.

TASER, argues, however, that even if Plaintiff was entitled to such a presumption, it is rebutted by Howze's declaration submitted in support of it's Motion for Summary Judgment in which he claims he would not have heeded an additional warning even if one had been given to him.[Dckt. 74-1, ¶ 15, 17]  *See; Smith v. Brown & Williamson Tobacco*

*Corp.,* 275 S.W.3d 748, 786 (Mo. Ct. App.2008).

But, rebuttal evidence typically creates a jury question as to causation. *Bachtel v. TASER, Intern., Inc.*, *supra*, 747 F. 3d at 97. Here, the attorney-crafted declaration of Deputy Howze uses 20/20 hindsight (something *Graham v. Conner,* 490 U.S. 386 (1989), cautions not to do) to suggest what he might have done had he been properly warned about the cardiac risks of firing darts into the chest. It is the role of the trier-of-fact to determine the credibility of Deputy Howze's "new" assertion. Apart from its highly speculative nature, there are several reasons why a reasonable trier-of-fact could determine that Howze's assertion lacks credibility, including: 1) he fired his X26 exactly how he had been trained, aiming at James Wilson's chest, 2) he has no history of insubordination while employed as a SCCSD deputy [Ex. "A", ¶ 35], and 3) by claiming he would have disregarded his training and specific warnings to avoid targeting the chest, he would have acted insubordinately [Ex. "A", ¶ 35]. Furthermore, Deputy Howze transitioned from his Glock firearm to his TASER X26 because he specifically determined that James Wilson was unarmed and the situation did not justify the use of deadly force. Now, however, Deputy Howze claims he would have fired at James Wilson's chest even if he had been given a warning not to do so risking the possibility that he might cause James to suffer a fatal cardiac arrest. [Ex. "A", ¶ 36]

In *Bachtel*, *supra*, 747 F.3d at 971-972, the court concluded that the officer involved would not have heeded a warning to avoid targeting the chest because "he had not been instructed on available warnings and did not heed the limited training he had received." [*Id.* at 972] Here, however, the undisputed facts show that Deputy Howze was provided the

most up-to-date training materials and product warnings. [See for example: Ex. "R", Thom Dep. p. 35:9-24: ". . . we had a CD-ROM that was given to us by the company [TASER] that contained the current training version, and then we also had to – as an instructor prior to training the class that we had to go on-line and get updates by the company, training updates . . . and then we would utilize those in the class to ensure that we were giving them [deputies] the most up-to-date training"; Thom dep. 36:1-16: "I would personally look . . . on-line, and look for updates, and then whatever was pertinent . . . , we would disseminate that information to the deputies, . . . including that in the training." Similarly, TASER has offered no evidence that Deputy Howze failed to read available warnings unlike the officer in *Bachtel* who was trained using out-of-date training versions and was not provided with current warnings.

For all of the above reasons, Gwennette Wilson has produced sufficient evidence to raise the presumption that Deputy Howze would have heeded a warning to avoid firing X26 darts into the chest to avoid cardiac risks had one been given to him.

## V. MISSOURI LAW DOES NOT REQUIRE EXPERT TESTIMONY IN PRODUCT DEFECT/FAILURE TO WARN CASES EXCEPT WHERE THE CLAIMS BEING ASSERTED ARE OUTSIDE THE COMMON KNOWLEDGE OR EXPERIENCE OF A JURY.

TASER next contends that it is entitled to summary judgment on Plaintiff's product defect/failure to warn claims because they are not supported by expert testimony. But, Plaintiff has produced sufficient evidence such that a jury composed of reasonable men and women with reasonable minds could infer that the X26 used by Deputy Howze should not have been fired at James Wilson's chest. *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.

W. 2d 371, 382, 385 (Mo. 1986)

Plaintiff's design defect/failure to warn theory is simple. Her core claim is that TASER manufactured and sold its X26 ECDs without adequate warnings or instruction for use. As a result, Plaintiff contends, James Wilson suffered cardiac arrest while the active current from a TASER Model X26 was passing through his heart. Plaintiff contends that a simple warning about this known cardiac risk, and a simple instruction to avoid chest shots – rather than the contrary instruction to target "center body mass" – would have eliminated the risk and spared Wilson's life. The X26 was designed to intentionally discharge a high-powered electrical current into a human body in order to cause "neuromuscular incapacitation". [Ex. "A", ¶ 5] Plaintiff's world-renowned expert electro-physiologist, Dr. Douglas P. Zipes, M.D., has explained in great detail how the electrical current from the X26 can result in cardiac capture leading to ventricular fibrillation and cardiac arrest. [Ex. "LL"] Plaintiff has also produced overwhelming evidence that TASER was warned by Dr. Tchou, prior to the sale of X26s to the SCCSD, that "avoidance" of darts near the heart "would greatly reduce any concern for induction of ventricular arrhythmias." [Ex. "J" at 810-811] It is undisputed that prior to September 30, 2008, TASER had not warned it users that firing X26 darts into the chest of a human being could potentially cause a cardiac arrest. [Ex. "Q", Klint dep. 73:12-23 (*Fontenot*); Ex. "A", ¶ 13] Deputy Howze was repeatedly trained to aim at center body mass which is exactly what he did when he fired his X26 at the center of James Wilson's chest.

Missouri courts, in numerous cases, have held that an expert is not required in every products liability case. (*Moslander v. Dayton Tire and Rubber Co.*, 628 S. W. 2d 899, 904 (Mo. Ct. App. 1981) – in a claim involving a defective tire, "expert testimony is not necessary to establish any of the elements, circumstances will suffice."; *Patterson v. Foster Forbes Glass Co.*, 674 S. W. 2d 599, 604 (Mo. Ct. App. 1984) – "the existence of a defect may be inferred from circumstantial evidence with or without expert testimony." (citing *Winters v. Sears, Roebuck and Co.*, 554 S. W. 2d 565, 569 (Mo. Ct. App. 1977)(See also: *Williams v. Ford Motor Co.*, 411 S. W. 2d 443, 447 (3) (Mo. Ct. App. 1966). In *Dancy v. Hyster Company*, 127 F. 3d 649, 654 (8th Cir. 1997), the Eighth Circuit held "proof of a specific defect is not required when common experience teaches the accident would not have occurred in the absence of a defect." "The doctrine of strict liability does not require impossible standards of proof. The proof 'must be realistically tailored to the circumstances which caused the form of action to be created.'" (*Winters v. Sears, Roebuck and Co, supra*, 554 S. W. 2d at 569 *citing Lindsay v. McDonnell Douglas Aircraft Corp.*, 460 F. 2d 631, 639 (14) (8th Cir. 1972))

In light of the above-described evidence, a jury composed of reasonable men and women with reasonable minds could infer that the X26 used by Deputy Howze should not have been fired at James Wilson's chest. Since the issue is a simple one, expert testimony would not aid a jury in reaching such a conclusion. In fact, a jury presented with the same evidence, and without the aid of a warnings expert, did find in favor of the plaintiff on her failure to warn claim [*Fontenot v. TASER, Inter., Inc.*, 736 F.3d 318, 324-25 (4th Cir. 2013)]

and that verdict was upheld by the Fourth Circuit.

**VI.    THE OPINION IN *BACHTEL* DOES NOT BAR PLAINTIFF'S DESIGN DEFECT/FAILURE TO WARN CLAIMS.**

Finally, TASER argues that the decision in *Bachtel v. TASER, Intl., Inc.*, 747 F. 3d 965 (8th Cir. 2014) bars Plaintiff's design defect/failure to warn claims.    However, as has been previously shown hereinabove, the facts of *Bachtel* are clearly distinguishable from the instant one.

In affirming District Judge Hamilton's grant of summary judgment to TASER in *Bachtel*, the Eighth Circuit found that there was "no genuine dispute that Officer Baird would not have read any additional warning TASER may have added as to the cardiac danger of the X26 ECD in any of its product warnings, bulletins, or in-training materials prepared after January 1, 2005." [*Id.* at 972] This conclusion was based on four critical evidentiary findings which do not exist in the present case: 1) Officer Baird had not been trained with up-to-date training materials, 2) Officer Baird had not been provided nor read available warnings or instructions, 3) Officer Baird disregarded the training he had received to use each "5-second cycle" as an opportunity to "go hands on"by firing his X26 for over 20-seconds during his initial deployment, and 4) Officer Baird disregarded his training that an officer should only take a chest shot "[i]n a scenario where a single officer is faced with a combative individual" and is unable to maneuver to target the individual's back [three other officers were present when Baird fired his X26 at Harlan's chest who was already partially handcuffed without the use of force]. [Id. at 972]

Unlike Officer Baird, Officer Howze was trained with up-to-date training materials and aimed and fired his X26 at Wilson's center body mass exactly as he had been taught. Unlike Officer Baird, who invoked his Fifth Amendment right refusing to testify as to whether he knew of the "specific danger that caused [Harlan's] injury", Deputy Howze testified that he did not believe, at the time he encountered James Wilson, that there were *any* risks associated with firing probes from an X26 into the chest of an individual. [Ex. "X", Howze dep. 192:2-7]  Based on this evidence, Gwennette Wilson is entitled to raise the presumption that an adequate warning would have been heeded whereas in *Bachtel*, the Plaintiff was barred as a matter of law from doing so.

The Court in *Bachtel* also concluded that the Plaintiff had failed to present evidence that the X26 was unreasonably dangerous as designed because she "failed to demonstrate any 'specific design choices' that rendered the model X26 ECD unreasonably dangerous." For purposes of imposing liability under Missouri's law of strict liability, a product's design is deemed defective when it is shown that the way that the product has been designed renders it unreasonably dangerous. *Nesselrode v. Executive Beach Craft, Inc.,* 707 S.W.2d 371, 377. Although Missouri courts have left the meaning of "unreasonably dangerous" to the common sense of the fact finder, *Linegar v. Armour of Am., Inc.,* 909 F.2d 1150, 1153 (8th Cir. 1990), a product is defectively designed if it "creates an unreasonable risk of danger to the consumer or user when put in normal use." *Id., citing Nesselrode,* 707 S.W.2d at 375.

In the present case, Plaintiff contends that the design choice – to encourage officers to aim the X26 at center body mass while knowing the cardiac risks of chest shots – rendered

the product defective.

For all of the reasons stated above, TASER's argument that the holding in *Bachtel* mandates the granting of it's summary judgment motion has no merit.

## VII.  CONCLUSION

Plaintiff has produced sufficient evidence to raise triable issues of fact with respect to her design defect/failure to warn claims which preclude the granting of summary judgment.  For all of the foregoing reasons, TASER's Motion for Summary Judgment should be denied.

DATED: July 16, 2014                    Respectfully submitted,

                                        *WILLIAMSON LAW FIRM*
                                        *DEVEREAUX, STOKES, NOLAN,*
                                        *FERNANDEZ & LEONARD, P.C.*


                                          /s/   PETER M. WILLIAMSON      
                                        *PETER M. WILLIAMSON, Pro Hac Counsel*
                                        *Attorneys for Plaintiff*
                                        *20750 Ventura Blvd., Suite 345*
                                        *Woodland Hills, CA 91364*
                                        *Email: pmw@pwilliamsonlaw.com*
                                        *Tel:  (818) 226-5700*
                                        *Fax:  (818) 226-5704*

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2014 a true and correct copy of the foregoing was electronically served on the following:

Greg Dohrman, Esq.
St. Charles County Counselor
100 North Third St., Suite 216
St. Charles, MO 63301
Tel:  (636) 949-7540
Email:  jleykam@sccmo.org

Michael Brave, Esq.
Isaiah Fields, Esq.
TASER International, Inc.,
17800 North 85th St.,
Scottsdale, AZ 85255
Tel: (480) 991-0797
Email: brave@TASER.com
Email: ifields@TASER.com

John Jerry Glas, Esq.
Duetsch Kerrigan & Stiles, LLP
755 Magazine Street
New Orleans, LA 70130
Tel: (504) 593-0677
Email: jglas@dkslaw.com

Matthew J. Reh, Esq.
Armstrong Teasdale
7700 Forsyth Blvd, Suite 1800
St. Louis, MO 63105
Tel:  (314) 621-5070
Email:  mreh@armstrongteasdale.com


　　　　　　　　　　／s/ PETER M. WILLIAMSON