EXHIBIT "A"

## DECLARATION OF MICHAEL LEONESIO

I, MICHAEL LEONESIO declare, under penalty of perjury, as follows:

1.	I am retained by the Williamson Law Firm as an expert in TASER® Model X26™ use, operation, effects, and training. I am submitting this declaration in support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment.

2.	I have a thorough understanding of the operation of the X26 weapon system and a thorough understanding of TASER International, Inc., X26 training practices, bulletins and warnings. I have received manufacturer's certifications as a TASER X26 User, Instructor, Master Instructor, and Armorer and have a thorough understanding of how officers are trained to use the X26, and the effect of that training on field behavior.

3.	As an officer with the San Carlos, California and Oakland, California police departments, I researched, wrote, reviewed, and implemented training, policy, and rules and procedures related to use of force, use of force reporting and investigation, and electroshock weapons use and testing. I have personally trained and certified hundreds of officers as users and instructors of the X26. I sat as the X26 expert on the Use of Force Review Boards at both departments and have investigated, reviewed and rendered opinions in thousands of law enforcement use of force cases. As a guest of TASER International, I attended six in-house medical and scientific research sessions held between February 2008 and July 2009 and have attended similar research sessions though other sources.

4.	A copy of my *Curriculum Vitae* outlining my experience and qualifications is attached as Ex. "1" to this Declaration.

5. TASER International, Inc., introduced the Model M26™ "Advanced TASER" in 1999, followed by the Model X26 – the product used on James Wilson – in May, 2003. The X26 fires two darts, one above the other, connected to wires leading to a removable/replaceable cartridge attached to the front of the weapon. The X26 laser sight, when selected, projects a red dot upon the intended target when the weapon's safety lever is switched off to the fire position. This dot represents the aim-point for the top dart.[1] Pulling the trigger fires the darts and, if a circuit is completed, discharges electrical current into the target for five seconds. Electrical exposures can be prolonged by holding the trigger, and repeated by re-pulling the trigger while darts remain in the target. The X26 is designed to deliver 19 electrical pulses per second. Each pulse has a peak current of 3-5 amperes. Although TASER International often cites the "average" current of the device (a much lower number), the peak current is more relevant because it relates to the maximum energy at any moment in time actually received by the individual who is being subjected to the electrical discharge. When a circuit is completed, each pulse is designed to cause uncontrollable muscle contractions. These pulses, when combined into a "cycle" of electrical stimulation, are designed to temporarily disable the target by creating a condition TASER International calls neuromuscular incapacitation. Over the years, TASER has taught that certain parts of the body, including the chest, have insufficient muscle mass to cause reliable and consistent neuromuscular incapacitation. This could explain why James Wilson did not collapse during the first cycle from Deputy Howze's X26.

---

[1] Ex. "F", TASER X26 User Course, Version 12, Slide 80 [The exhibits referenced in this declaration can be found in the Plaintiff's Global Appendix of Exhibits filed in opposition to TASER's Motion for Summary Judgment]

6. When selling its products to law enforcement agencies such as the St. Charles County Sheriff's Department, TASER International insists on strict compliance with its training program. TASER International issues updated training program versions roughly every year or two. The relevant training versions for this case are 12, 13, and 14. Version 13 is a major revision from Version 12, but Versions 13 and 14 are very similar to the other. The current training version available is Version 19. Each training version includes PowerPoints with slides and videos for training instructors and users, along with multiple other documents, including forms, tests, lesson plans and warnings.

7. TASER International has several "senior master instructors" who work closely with the company under the supervision of Rick Guilbault, a company executive. They train and certify "master instructors," such as me. Master instructors may, in turn, contract with TASER International, which pays the master instructor a fee to teach and certify trainers from the various agencies who purchase the X26. These "certified instructors," who are usually paid by their respective agencies, then train individual users. As a master instructor, I personally trained a number of officers from different agencies and certified them so that they could certify users at their own departments. As a certified instructor and master instructor, I trained and certified users at both the San Carlos and Oakland police departments. It is through this training protocol, and not through packaging or product manuals, that TASER International's instructions for use and warnings are communicated to its instructors and users.

8.    TASER International offers training courses in which the company certifies TASER Master Instructors, Advanced Instructors, Instructors and Technicians and exercises tight control throughout the training process. TASER International develops, writes, produces and distributes all TASER approved law enforcement training materials and programs, and will not recognize users, instructors and technicians taught outside of this tightly controlled system.  Generally speaking, officers will not be considered "certified" unless they complete a TASER approved and certified training program taught by a TASER approved and certified instructor using TASER approved and certified training materials and warnings.

9.    TASER Master Instructors and Advanced Instructors are trained at the annual Master Instructor School. This five-day certification course is taught by TASER International personnel and TASER certified Senior Master Instructors. This in-depth course includes instruction on the latest legal updates and medical research, safety considerations and warnings, scenario-based training, training drills, all TASER products, weapon maintenance, crime scene investigation, instructor development and a review of all TASER training materials. Master Instructor School attendees must pass written, oral and performance tests, sign a *Master Instructor: Warnings, Risks, Release & Indemnification Agreement* and experience the effects of a TASER device. The general requirements for Master or Advanced Instructor candidates are:

- Minimum 5 years as a sworn law enforcement officer
- Minimum of 2 years as a law enforcement instructor
- Currently certified TASER Instructor
- Instructed a minimum of 12 TASER user courses

10. Applicants must complete a Master Instructor application, send a current resume, supply a letter of recommendation from the applicant's Chief, Sheriff, or agency director, and pay a registration fee. Once certified, Master and Advanced Instructors are authorized to teach Instructor and user courses and are eligible to teach courses under contract with TASER International.

11. Besides issuing the training versions mentioned above, TASER International regularly distributes training bulletins.  For example, between TASER's sale of X26's to St. Charles County on April 20, 2005 and the date of James Wilson's death on May 6, 2008, it issued 19 separate bulletins. These bulletins include product changes and updates, revised product risks and warnings and updated training materials to name a few. Also, TASER International directs that all instructors must check the TASER.COM website for the latest training materials, warnings and bulletins within 72 hours of each training session. When new versions of the training materials and product warnings are released, the materials explicitly instruct that all prior editions have been superseded and rendered obsolete.

12. Prior to the date of James Wilson's death on May 6, 2008, TASER International never officially informed its customers, instructors or users that X26 darts fired directly into the chest of people, especially where the current pathway might flow near the heart, could increase the risk of cardiac arrest. To the contrary, TASER International instructed that the X26 be fired at "center of mass" like a firearm, and that its scientific testing (primarily animal studies) showed there to be no cardiac risk from such a deployment. TASER International consistently reassured customers, instructors and users that there was

not enough electrical output from a TASER device to affect cardiac tissue and that any in-custody death due to cardiac arrest temporal to TASER use was coincidental.

13. TASER issued Training Bulletin 15.0 in September, 2009 in which it first mentioned there is an increased risk of cardiac arrest from shots to the chest, near the heart.[2]

14. In preparation for drafting this declaration, I reviewed the Declaration of Deputy Howze[3] filed in support of TASER's Motion for Summary Judgment. Previously, I had also reviewed his X26 training records. Based on my education, background, training and experience as a use of force and X26 expert, I believe I am qualified to comment on several statements made by Deputy Howze in his declaration.

15. In Paragraph 11 of Deputy Howze's declaration he states:

"When Mr. Wilson was about 8 feet from me (a vehicle width), I could see his hands were empty so I transitioned from my firearm to my X26 CEW. As I was transitioning weapons, Mr. Wilson continued to walk toward me yelling and closing the gap between us. As soon as my CEW cleared its holster, I ordered Mr. Wilson to "stop." He didn't. I acted immediately and deployed my CEW from approximately 2-feet away to avoid a physical altercation."

16. First, it should be noted that Deputy Howze claimed that he and James Wilson were standing at the rear corners of a 2005 Mazda Tribute when they first encountered each other.[4] This fact was confirmed by eyewitness, Barry Thornell, who estimated the distance between the two men to be 6 feet.[5] Mr. Thornell's estimate appears accurate in that the width

---

[2] Ex. "AA", TASER International Training Bulletin 15.0

[3] Dckt. # 74-1

[4] Ex. "X", Howze Deposition, p. 34:7-12; 98:16-25, 99:1

[5] Ex. "BB", Thornell Deposition, p. 37:24 – 38:3

-6-

of a 2005 Mazda Tribute is exactly 6 feet (72 inches).[6]

17.     From this distance of 6 feet, Deputy Howze claims that James Wilson began to walk towards him as he holstered his Glock firearm and drew his X26 and aimed it at Wilson.[7]  Based on my experience, it would take approximately three (3) seconds, minimum, for a police officer to holster a firearm, unholster an X26 and raise it to firing position.  In three seconds, a person walking at even a slow pace would be able to cover a distance much greater than 6 feet, which is only two paces.

18.     Deputy Howze also claims that he and James Wilson stood facing each other for less than two seconds before Wilson began to walk towards him.[8]  This statement is disputed by eyewitness Barry Thornell who, in his deposition testimony, reported he observed Howze and Wilson standing 6 feet apart for approximately 10 seconds during which Wilson did not move towards Howze.[9]

19.     In addition, the TASER probe marks on James Wilson's chest at autopsy measured a spread of 4.2 inches.   This would suggest that the distance from the front edge of the X26 to James Wilson's chest was approximately 30 inches (2½ feet).   This is misleading, however, and does not reflect the true distance between Deputy Howze and James Wilson at the time the X26 was fired the first time.   To determine the true distance, one must calculate the distance from the known probe spread (approximately 30 inches), then

---

[6] http://www.cars.com/mazda/tribute/2005/specifications

[7] Ex "X", Howze deposition, p. 36:12-17

[8] Id., p. 111:22-25 – 112:1

[9] Ex. "BB", Thornell deposition, p. 38:10-22

combine that distance with the length of the X26 (6 inches) and the length of Deputy Howze's arm, as X26 users are taught to extend their arm in front of them when firing the weapon as they would with a firearm. Assuming the arm length of Deputy Howze (measured shoulder to palm) is between 24 and 30 inches, the total distance between Howze and Wilson was actually 60 to 66 inches or 5 to 5½ feet. This distance is consistent with Deputy Howze's original reporting of the contact, supports eyewitness Thornell's accounting of the event, and disputes the claim by Deputy Howze that James Wilson was walking towards him when he first fired his X26.

20. Deputy Howze claims that "I could not target or aim at Mr. Wilson's beltline because of the speed of the situation."[10] The previously mentioned sworn testimony of Barry Thornell disputes this and suggests Deputy Howze had ample time to aim at a part of the body other than James Wilson's chest. More telling is the fact that Deputy Howze testified that he had sufficient time to aim his X26 at James Wilson's chest even observing the red laser dot on Wilson's chest. The following statement is most telling because Deputy Howze clearly indicates that he had time to aim and purposefully target his X26 at Wilson's chest:

> ". . . . by the time I had transitioned, and once my taser had cleared its holster, I said stop. And when he didn't <mark>I made sure the laser site was center mass</mark> and I pulled the trigger." [11]

\* \* \* \* \*

" . . . . as soon as my taser cleared its holster, I said stop, *put the laser sight in*

---

[10] Dckt. # 74-1, paragraph 12

[11] Ex. "X", Howze deposition, p. 41:11-15 [emphasis added]

*his chest center mass*, and he continued to come. So I pulled the trigger." [12]

\* \* \* \* \*

Q. Now, if I remember your testimony this morning, you said that you used your - - the laser targeting of the device right?
A. Yes.
Q. And you targeted center body mass, right?
A. Yes.
Q. *You had time to do that, correct?*
A. *Yes.*[13]

\* \* \* \* \*

Q. *Could you literally see the laser hit Mr. Wilson in the chest?*
A. *Yes.*
Q. Is it a red dot?
A. Yes.
Q. *And you could see that red dot right in the middle of his chest?*
A. *Yes.*[14]

21. Deputy Howze further claims that "Because of Mr. Wilson's conduct and demeanor and the fast moving circumstances presented, no other warning, instruction or information from TASER or any other source would have caused me to do anything differently than what I did in terms of how and where I deployed my TASER X26 CEW into Mr. Wilson." [15] Again, the deposition testimony of Deputy Howze explains why he targeted Mr. Wilson's chest just as he had been taught to do:

Q. In other words, had you wanted to, for example, if you wanted to shoot it, split the beltline for example, you had time to do that?

---

[12] Ex. "X", Howze deposition, p. 49:1-4 [emphasis added]

[13] Ex. "X", Howze deposition, p. 114:20-25; 115:1-3 [emphasis added]

[14] Ex. "X", Howze deposition, p. 116:5-12 [emphasis added]

[15] Dckt. # 74-1, paragraph 15

A.  I didn't feel that I did.
Q.  Well, why is it that you had time to target center body mass but not [sic] had time to target an area which would have been splitting the beltline?
A.  *Center body mass is a natural point of aim for any type of weapon. That's how I've been trained my entire career.*
Q.  *So you're kind of relying on muscle memory everything you've been taught you said you're supposed to fire center body mass, weapons, taser, everything?*

Mr. Braze [sic]:  Objection, form.

A.  *Yes.*
Q.  Okay. So the idea of muscle memory is you don't have to think about it. *You just immediately draw your weapon and if you're prepared to fire, you're targeting a specific part of the body, correct?*
A.  *The torso, yes.*
Q.  Okay. *And that was consistent with the training you had received with respect to the targeting and firing of the Taser X26, correct?*
A.  *Yes.*[16]

22. The testimony of Deputy Howze concerning muscle memory is important. Police training, including TASER X26 training, is based on repetition. Hesitation in certain situations can be life-threatening. Muscle memory is created based on repetitive training. As Deputy Howze confirms, he was *repeatedly* trained to aim the X26 at center body mass, i.e. the center of the torso or chest area:

Q.  Do you remember - - are you familiar with the terms center body mass?
A.  Yes.
Q.  You used that term earlier this morning several times. What is your understanding of the meaning center body mass?
A.  In my years of using the term, it means the center of the torso.
Q.  Okay. *And do you recall being taught in December 2005 that that would be the preferred target area, center body mass, the torso portion of the body?*
A.  Yes.[17]

---

[16] Ex. "X", Howze deposition, p. 115:4-25; 116:1-4 [emphasis added]

[17] Ex. "X", Howze deposition, p. 75:13-24 [emphasis added]

-10-

* * * * *

Q. Was it your understanding on the day of this incident, based on the training you had received, that the preferred target area was center body mass?

Mr. Braze [sic]: Objection. Form.

A. *The understanding I had was to aim for the torso.*[18]

* * * * *

Center body mass or center torso is the natural point of aim for any type of weapon. That is how officers are trained and repetitive firearms practice develops "muscle memory" so an officer automatically targets that zone.[19]

23. It is clear from the testimony of Deputy Howze that his targeting of James Wilson's chest was solely based on the muscle memory he developed from his repetitive training which taught him to target center body mass. His muscle memory would have developed differently had he been taught to avoid targeting the chest.

24. Deputy Howze training records establish that he attended at least three formal TASER training classes:[20]

- December 9, 2005 – X26 User Course
- December 5, 2006 – X26 User Re-Certification
- January 8, 2008 – X26 User Re-Certification

25. TASER training Version 12 was released in November, 2004 and remained in effect until April 30, 2006. Version 12 would have been used to train Deputy Howze at the time of his initial X26 User Course on December 9, 2005. Version 12 includes a PowerPoint presentation which was shown to Deputy Howze. One of the initial slides in this

---

[18] Ex. "X", Howze deposition, p. 77:20-25 [emphasis added]

[19] Dckt. #74-1, paragraph 12

[20] Dckt. #74-1, Exhibit A

PowerPoint presentation depicts a TASER deployment into the chest (not splitting the beltline) of an individual:



Ex. "CC", TASER X26 User Course, Ver. 12, Slide 13

26. Version 12 also includes the following slides:





Ex. "F", TASER X26 User Course, Ver. 12, Slide 80

0082



Ex. "DD", TASER X26 User Course, Ver. 12, Slide 82

27. All of the above slides serve to reinforce in the X26 trainee that the preferred target area for the X26 is center body mass, i.e. the chest.

28. TASER training Version 13 was released on May 6, 2006 and remained in effect until November 30, 2007. Version 13 would have been used to train Deputy Howze at the time of his X26 Re-Certification Course on December 5, 2006. Like Version 12, Version 13 includes a PowerPoint presentation which would have been shown to Deputy Howze. Version 13 includes several slides that depict or instruct officers to target "center of mass",[21] once again reinforcing in the X26 user that the preferred target area for the X26 is center body mass, i.e. the chest.

29. TASER training Version 14 was released on December 1, 2007 and remained in effect until August 31, 2008. Version 14 would have been used to train Deputy Howze at the time of his second X26 Re-Certification Course on January 8, 2008. The date of this training is significant because it occurred just 4 months before the incident involving James Wilson. Like Versions 12 and 13 before it, Version 14 includes a PowerPoint presentation

---

[21] Version 13 features the referenced slides at positions 11, 67, 68, 69, 70, 71, and 75 of the presentation.

-13-

which would have been shown to Deputy Howze. Version 14 also includes slides that depict or instruct officers to target "center of mass",[22] once again reinforcing that the preferred target area for the X26 is center body mass, i.e. the chest.

30.     The repeated reinforcement that Deputy Howze received from his X26 training to target center body mass created the muscle memory that he relied on during his encounter with James Wilson. As with soldiers, airline pilots, etc., the repetitive reinforcement of training techniques that police officers undergo is essential to ensure safe, consistent and repeatable field performance. Based on this training, it is highly unlikely that a police officer, like Deputy Howze, would have fired his X26 at any body part other than center body mass with a subject facing him. In this regard, Deputy Howze acted in total conformity with his training.

31.     According to Deputy Howze, "The TASER training slides I saw in all of my training courses taught that targeting a subject's back is preferred 'when practical.'"[23] At the same time, he admits that targeting James Wilson's back was not practical because James Wilson was facing him. This claim, however, is contrary to the statements made in his deposition that indicated he had been trained to target center body mass.[24] At no point in his deposition testimony did Deputy Howze ever mention he had been taught to target the back.

---

[22] Version 14 features the referenced slides at positions 13, 220, 144 and 145 of the presentation.

[23] Dckt. #74-1, paragraph 14

[24] Ex. "X", Howze deposition, pp. 41:1-16; 48:19-25; 49:1-4; 75:13-24; 77:20-25; 78:1-6; 114:20-25; 115:1, 21-25; 116:1-7

-14-

32. Deputy Howze admits that he became aware that TASER "changed its recommended Targeting from 'center mass' to 'lower center mass' for front shots."[25] In fact, TASER issued Training Bulletin 15.0 on September 30, 2009 more than 16 months after Wilson's death. Bulletin 15.0 states in pertinent part:

1. **We have issued a new TASER targeting Guide that will apply for the new XREP impact munition as well as ECDs such as the X26, M26 and X3.** Note, we have lowered the recommended point of aim from center of mass to lower-center of mass for front shots. . . .[26]

\* \* \* \* \*

  b. When possible, avoiding chest shots with ECDs avoids the controversy about whether ECDs do or do not affect the human heart.[27]

33. Most importantly, Deputy Howze speculates that even if he had been warned about the potential cardiac risks from chests shots prior his encounter with James Wilson, he would have still deployed his X26 in the same manner.

> Moreover, *had I been warned of the potential for rare cardiac risks from CEW chest shots prior to May 2008*, I still would have chosen to use my CEW over my firearm or going hands-on with Mr. Wilson without radio or backup. It was Mr. Wilson's own noncompliance and aggressive actions that removed my alternative targeting options.[28]

34. Deputy Howze's statement implies that he had not been warned about the cardiac risks from X26 chest shots prior to May, 2008. This is consistent with the fact that

---

[25] Dckt. #74-1, paragraph 16

[26] Ex. "AA", TASER International, Training Bulletin 15.0, p. 2, paragraph 3 [emphasis in original]

[27] Ex. "AA", TASER International, Training Bulletin 15.0, p. 2, paragraph 5

[28] Dckt. #74-1, paragraph 17 [emphasis added]

prior to the date of James Wilson's death on May 6, 2008, TASER International never informed its customers, instructors or users that X26 darts fired directly into the chest of people, especially where the current pathway might flow near the heart, can increase the risk of cardiac arrest. To the contrary, TASER International instructed that its scientific testing (primarily animal studies) showed there to be no cardiac risk from such a deployment. TASER International consistently reassured customers, instructors and users that there was not enough electrical output from a TASER device to affect cardiac tissue and that any in-custody death due to cardiac arrest was coincidence.

35.     By speculating that even if he had been warned about the cardiac risks of chest shots during his X26 training, he would have ignored the warning and still targeted James Wilson's chest, suggests he would have acted insubordinately, risking killing someone when deadly force was clearly not warranted and a non-lethal option would have been more effective.  Nothing in the training records I reviewed indicated that Deputy Howze was or is an insubordinate deputy.  Law enforcement officers are trained to follow proper procedures and training, not ignore them as they see fit.  Failure to follow training results in a lack of discipline and undermines the very nature of effective law enforcement.

36.     In addition, Deputy Howze statement suggests that he would have targeted the chest despite the cardiac risks (had he received such a warning)with the knowledge that he might cause death or serious bodily injury to an individual who he determined was unarmed and, according to Howze, was simply walking slowly towards him.  But, Deputy Howze makes clear in his deposition testimony that he transitioned from his Glock to his X26

-17-

specifically because he determined that the situation did not call for deadly force.

I declare under penalty of perjury that the foregoing is true and correct based on my personal knowledge.

Executed on July 10, 2014, in Athens, Tennessee.

_____
Michael Leonesio