EXHIBIT "I"

1   IN THE CIRCUIT COURT OF

2   THE CITY OF ST. LOUIS

3   STATE OF MISSOURI

4

5   COLIN FAHY,

6   Plaintiff,

7   vs.                    Case No. 0922-CC10076-01

8   TASER INTERNATIONAL, INC., AND ED ROEHR AUTO RADIO CO.,

9   D/B/A/ ED ROEHR SAFETY PRODUCTS CO.,

10   Defendants.

11   - - - - -

12   VIDEOTAPED DEPOSITION OF

13   PATRICK TCHOU, M.D.

14

15   Taken on Wednesday, July 18, 2012, at 8:40 a.m.

16   At the offices of Cleveland Clinic Foundation, 9500

17   Euclid Avenue, Building J, Cleveland, Ohio, before

18   Janice M. Rogers, a Registered Professional Reporter

19   and Notary Public in and for the State of Ohio.

20

21        PROFESSIONAL COURT REPORTING & VIDEO

22     Certified Court Reporters and Videographers

23            235 East Broad Street

24         Westfield, New Jersey 07090

25              908.228.5261

1          THE VIDEOGRAPHER:  This is the

2     deposition of Dr. Tschou, Patrick Tschou, M.D.,

3     cause number 0922-CC10076-01 in the cause Colin

4     Fahy versus Taser International.

5               We're on the record.  Will the court

6     reporter please swear in the witness.

7     PATRICK TCHOU, of lawful age, called for

8     examination, being by me first duly sworn, as

9     hereinafter certified, deposed and said as

10    follows:

11    EXAMINATION OF PATRICK TCHOU

12    BY-MR.BURTON:

13          Q.    Good morning, Dr. Tschou.  Thank you

14    for taking time out of your busy schedule to meet

15    with us today.

16               My name is John Burton.  I am an

17    attorney for a gentleman named Colin Fahy.  He is

18    not a patient of yours.  As far as I know you

19    know absolutely nothing about his case.

20               Just in thumbnail form, he was

21    shocked with a taser X26.  He did subsequent to

22    that -- and there's a dispute what subsequent

23    means that you don't need to worry about -- go

24    into cardiac arrest.  He was revived.

25               And he has filed a lawsuit against

0005

1  Taser.  You've never seen this patient as far as
2  I know.  You have never heard about this case
3  otherwise.
4              I'm not going to be asking you any
5  specifics about this case.  You're not designated
6  as an expert witness in this matter.  Although I
7  believe your former resident, Dr. Lakkireddy, is
8  an expert witness for Taser International.
9              What I wanted to ask you about,
10 because it's come up in a number of these cases,
11 is the research that you personally did for Taser
12 International, which I understood took place
13 2005, 2006 and resulted in at least two published
14 papers.  The first one I would call the effects
15 of cocaine intoxication.  And the second one I
16 would call barb location, if that's okay with
17 you.
18             And you've had your deposition taken
19 before?
20      A.    Yes.
21      Q.    Okay.  So just make sure you answer
22 yes or no and not shake or nod your head,
23 although the last ones obviously didn't matter.
24             And have you ever had your
25 deposition taken before in a taser related case?
1       A.    No.
2       Q.    Okay.  I'm just going to cut right
3  to the chase.  We have your biography from your
4  website.  We know who you are.
5              Could you tell us how you first came
6  in contact with Taser International?
7       A.    I was approached by them to consider
8  doing a study.  And that's how I was first in
9  contact with them.
10      Q.    Prior to when you were first
11 approached by Taser International, had you had
12 any personal scientific or medical experience
13 with what we could call electronic control
14 devices or ECDs?
15      A.    None.
16      Q.    And who approached you?
17      A.    I believe it was Mark Kroll.
18      Q.    I notice that you are co-author with
19 Dr. Kroll on at least one article I saw.
20             Was it around the same time that you
21 were working on an article with him?
22      A.    I don't know the exact time
23 relationship.  I have worked on and off with Mark
24 Kroll probably for 20 years.
25      Q.    And can you give us your best

1 estimate of when Dr. Kroll approached you to do a

2 research project for Taser International?

3        A.    I would say it would have been

4 approximately two years before the first

5 publication.

6        Q.    So would late 2004, early 2005?

7        A.    Something like that.  I can't be

8 certain about it.  But based on, you know, the

9 delays of getting a study done, getting

10 everything approved first and then publication

11 reviews and so on, I would estimate it was

12 probably about two years before.

13        Q.    What exactly did he outline in terms

14 of the project that Taser was interested in?

15        A.    There had been several studies in

16 the literature at that point.  And they wanted --

17 they wanted to do additional studies to, you

18 know, have reproducibility basically of data that

19 had been previously published.

20             And, you know, approached us to do a

21 study.  They didn't outline any specifics about a

22 study.  But they asked us to consider doing

23 another study.

24        Q.    Was the study that they asked you to

25 do specifically related to the effect of cocaine

1  involved in the animal labs that may have been

2  also involved in, you know, the details of how

3  that should be done.

4        Q.    And when I spoke to Dr. Lakkireddy

5  about this, he characterized you as his mentor at

6  the time.  Do you agree with that?

7        A.    Yes.  He was a cardiac

8  electrophysiology fellow here in training at the

9  time.  And I was a staff member here.

10       Q.    So you looked at the pace study that

11  had been done by Dr. Stratbucker and

12  Dr. McDaniel, for example?

13       A.    Those names sound familiar.  I would

14  probably have looked at it, although I don't

15  recall exactly now what we looked at prior to

16  putting together the proposal.

17       Q.    Excuse me.  I forgot my phone.

18             And then what was the next step

19  after you prepared your proposal?

20       A.    The next step was the -- Taser

21  approved their funding for the proposal.  And so

22  then we proceeded to do the experiments.

23       Q.    Now, you -- is it correct that you

24  authored your -- you are the author, co-author on

25  two peer reviewed publications arising from these

1  experiments?

2       A.    I think there were a total of three

3  that arose from those experiments.

4       Q.    And what was the third, if there's

5  effect of cocaine intoxication and barb position?

6       A.    The third one was looking at whether

7  there was any deleterious effect on pacemakers

8  and implantable defibrillators from the taser

9  shocks.

10      Q.    Now, at one point, did you -- at one

11  point you actually went into the laboratory with

12  pigs, correct?

13      A.    Correct.

14      Q.    Prior to that point did you meet

15  with any taser representative, other than

16  Dr. Kroll?

17      A.    I don't recall meeting with anybody

18  else.  In fact, I don't even recall face to face

19  meetings with Dr. Kroll, other than our

20  communication via e-mail and, you know, sending

21  the proposals, a design of our experiments and so

22  on back and forth.

23      Q.    When you actually experimented on

24  the pigs --

25      A.    Correct.

1   there were longer darts being shot at people?

2        A.     I'm not aware not even now that

3   there is a longer dart, so I don't think I was

4   aware of it at that time.

5        Q.     Okay.  Do you recall meeting with

6   any executive, like Rick Smith, for example, the

7   CEO with Taser International, before you actually

8   sat down and did the experiments?

9        A.     No, we did not meet with him.

10       Q.     As far as you can recall today, is

11  the only person that you actually recall talking

12  to at Taser Mark Kroll?

13       A.     Yes, that's correct.

14       Q.     Now, did you tell Dr. Kroll that you

15  had a device that you were going to be able to

16  insert into the pig that would measure as to

17  whether the device was causing cardiac capture?

18       A.     That was part of our proposal, was

19  that we were going to do that, correct.

20       Q.     Okay.  And what do you call that

21  device?

22       A.     That we inserted into the pig?

23       Q.     Yes.

24       A.     It was a standard cardiac pacing and

25  recording catheter.

1          Q.     Can we call it a cardiac catheter,

2    is that okay?

3          A.     Well, electrode catheter probably

4    would be a more accurate description.

5          Q.     A cardiac electrode catheter?

6          A.     Yes.

7          Q.     And to your knowledge at that time,

8    was yours the first experiment to use a cardiac

9    electrode catheter in a pig experiment with an

10   electrical control device?

11         A.     Yes, I think that was the -- that

12   was my -- that's my recollection right now, that

13   when we reviewed the literature, we thought we

14   can improve on the, you know, defining the

15   various outcomes and so on by inserting a

16   catheter to record electrical activity from

17   inside the heart.

18         Q.     Okay.  So I'd like to go through

19   these experiments and obviously as quickly as

20   possible to kind of fill in some details.

21                So I understand there were 13 pigs.

22   And you have the size ranges in there.  They're

23   relatively small pigs, around 70, 80 pounds,

24   somewhere in there.  You had certain dart

25   positions that you tested.  The pigs were all

1      A.      Yes.

2          Q.      So bracketing the heart at a very

3  close proximity to the myocardium had the lowest

4  safety margin, where the ones in the back had the

5  highest, correct?

6      A.      That's correct.

7          Q.      Okay.  So based on this, if you were

8  talking to some police officer that was shooting

9  human beings with tasers, you would tell them,

10  based on our research, in terms of the risk of

11  inducing cardiac capture and ventricular

12  fibrillation, it's going to be safer to shoot

13  them in the back than shoot them in the front?

14              MR. MALEY:  Object to form.

15      A.      I would think that that would be

16  pretty obvious from our experimental data that

17  that would be the case.

18          Q.      And you also made a finding that

19  induction of VF was associated with barb

20  proximity to the heart, correct?

21      A.      Yes.

22          Q.      And that the capture rate was

23  closely associated with barb proximity to the

24  heart, correct?

25      A.      Yes, that's correct.

```
 1          Q.    Okay.  From the very beginning, as
 2   we obtained our data from our animal study, I had
 3   advised Taser that the possibility of inducing
 4   ventricular arrhythmias is there and at the
 5   minimum we cannot categorically say this is not
 6   possible.  Do you see that?
 7          A.    Uh-huh.
 8          Q.    Okay.  What I'm concerned about is,
 9   I had advised Taser that the possibility of
10   inducing ventricular arrhythmias is there.  From
11   the beginning, as we obtained our data from our
12   animal study, I had advised Taser that the
13   possibility of inducing ventricular arrhythmia is
14   there.
15                What were you referring to?
16          A.    When we gathered all our data for --
17   from the experiments, we presented that data to
18   Taser.
19          Q.    That was in advance of when you
20   prepared your abstracts and everything?
21          A.    That was in advance of -- that was
22   immediately after we've collated all the data and
23   analyzed it.  And we presented that data to Taser
24   at that time, yes.
25          Q.    Okay.  And so would that have been
```

1    sometime in 2005?

2          A.      It would be sometime after we

3    finished the experiments and before present --

4    before presentation at the meetings or

5    publications.  But I don't know exactly the

6    timing right now.

7                MR. BURTON:  Dr. Tchou or,

8    Ms. DiFranco, maybe I could ask you this.  Is

9    there like a record you could look at that would

10   be like -- like the log of the laboratory or

11   something, and you could say, oh, we did the pig

12   experiments from June 1st to July 27th, you know,

13   2005 or whenever?

14               MS. DiFRANCO:  You could put a

15   request in.  And we can look.  I don't know if

16   one -- such information, how to extrapolate that.

17               MR. BURTON:  Okay.  Well, I'll write

18   you a letter.

19         Q.      I think it was around sometime mid

20   2005, as I put all the dates together.  Does that

21   sound right?

22         A.      Approximately that's correct.  It

23   could be plus or minus a year or something like

24   that.

25         Q.      Because the paper was issued in May

1   of 2006.   And that was Dr. Lakkireddy's estimate.

2          A.     Yes.   That could be close enough.

3          Q.     Okay.

4                 MR. BURTON:   It would be interesting

5   just to get those exact dates, so we wouldn't

6   have this.   So I'll write you a letter.

7                 MS. DiFRANCO:   Thank you.

8                 MR. BURTON:   I mean, I imagine

9   there's a log or something --

10                MS. DiFRANCO:   I don't know.

11                MR. BURTON:   -- in a lab so we don't

12  have to guess.   And I understand how years run

13  together.

14         Q.     So you completed your study.   You

15  compiled your data.   Let's just say the last day

16  of -- that you're actually in the lab, okay, now

17  we're through with the pigs.   We're going to sit

18  down and we're going to prepare our data, analyze

19  it and prepare our articles.

20                It was after that that you first

21  told Taser about your results?

22         A.     Yeah, it was after we finished all

23  the experiments where we put together the data

24  that we actually made a presentation to them.

25         Q.     And who was there?

1    A.    I don't recall exactly who was

2  there.  But I would -- they were certainly people

3  in, you know, the administrative branch.  There

4  was probably three or four people there.

5    Q.    Do you know if Rick Smith, the CEO,

6  was there?

7    A.    I don't recall exactly who was

8  there, so I can't say that whether he was there

9  or not.

10    Q.    Can you say whether Mark Kroll was

11  there?

12    A.    I can't be sure actually.

13    Q.    Now, are we talking about --

14    A.    It's quite a few years back.

15    Q.    Let's say, do you know -- let's say

16  the last day, okay, is X.  Let's say it was

17  August 1st.  That was the day you wrapped in the

18  lab, just hypothetically.

19    A.    Uh-huh, yes.

20    Q.    How long after that last day when

21  you wrapped in the lab do you think this meeting

22  was?  Are we talking about a week, a month, a

23  couple months?

24    A.    I would say it would probably be

25  more in the range of two to four months time

1  frame.

2          Q.      And then maybe it was six months or

3  so after that that you presented the abstract,

4  just using very general kind of numbers?

5          A.      That could be a good estimate.

6          Q.      Okay.  Can you just -- was it you

7  and Dr. Lakkireddy who made the presentation?

8          A.      Yes, that's correct.

9          Q.      Okay.

10         A.      I believe we were both there.

11         Q.      And who was doing the talking or who

12 did it?

13         A.      Dr. Lakkireddy basically presented

14 the data.

15         Q.      And what was the upshot of what you

16 told Taser at this meeting?

17         A.      I don't know what you mean by

18 upshot.

19         Q.      Well, was it that there's a --

20 because of our data on capture, there's a

21 possibility of inducing ventricular fibrillation,

22 if the barbs are located too close to the heart?

23         A.      I don't know whether that specific

24 thing was discussed at the first presentation or

25 not.

1      Q.    Well, what was?  You said here -- I

2  mean, I'm basing it on what you said to

3  Dr. Zipes.

4      A.    Uh-huh.

5      Q.    Which was, I advised Taser the

6  possibility of inducing ventricular arrhythmia is

7  there.

8      A.    At some point in time, when we

9  discussed the results of the study, I had

10  indicated that despite the fact that we did not

11  induce ventricular fibrillation in any of the

12  pigs, that because of our capture data, I would

13  caution them that there is some possibility that

14  this could induce ventricular arrhythmias in

15  people.

16      Q.    And did you tell them that according

17  to your data, the safety margin would increase,

18  if the dart locations were further away from the

19  chest or the heart?

20      A.    Oh, I think that was very clear from

21  our data.  So I don't recall specifically saying

22  those words.  But I very likely would have

23  indicated that.

24      Q.    So you had this let's say kind of

25  first meeting with Taser?

1                    CERTIFICATE

2

3    State of Ohio )              SS:

4    County of Cuyahoga.)

5              I, Janice M. Rogers, Notary Public

6    within and for the State of Ohio, duly

7    commissioned and qualified, do hereby certify

8    that the within named witness was duly sworn to

9    testify to the truth, the whole truth and nothing

10   but the truth in the cause aforesaid; that the

11   testimony then given by the witness was by me

12   reduced to stenotypy in the presence of said

13   witness; afterwards transcribed, and that the

14   foregoing is a true and correct transcription of

15   the testimony so given by the witness.

16              I do further certify that this

17   deposition was taken at the time and place in the

18   foregoing caption specified.

19              I do further certify that I am not a

20   relative, counsel or attorney for either party,

21   or otherwise interested in the event of this

22   action.

23              I am not, nor is the court reporting

24   firm with which I am affiliated, under a contract

25   as defined in Civil Rule 28 (D).

1            IN WITNESS WHEREOF, I have hereunto

2    set my hand this      day of    , 2012.

3

4

5

6

7            _____

8            Janice M. Rogers, Notary Public

9            within and for the State of Ohio.

10

11

12

13            My commission expires August 7, 2017.

14

15

16

17

18

19

20

21

22

23

24

25