# Patrick Tchou, M.D.

# Mitchell v. Taser International

## September 23, 2013

Connor Reporting
1650 One American Square
Indianapolis, IN 46282
(800)554-3376
(317)236-6022
www.connorreporting.com

Patrick Tchou, M.D.
September 23, 2013

### 69

1  relate to pacing and electrophysiology, his
2  professional work overlaps in a certain area with
3  yours?
4  A  Yes. I believe it was with implantable
5  defibrillators that we first interacted.
6  Q  And is he the kind of friend that you would,
7  let's say, if you were in the same place, like a
8  Heart Rhythm Society conference, go to dinner
9  together if it was convenient with your wives?
10  A  Yeah.
11  Q  In fact --
12  A  If his wife was around and my wife was around
13  and we happened to meet at a society meeting, we may
14  well say let's go to dinner.
15  Q  And I asked that for a purpose because Mark
16  Kroll said that at the 2005 Heart Rhythm Society
17  meeting -- and I'm sure they all run together -- do
18  you go to basically every one or try to?
19  A  I probably missed a few over the last 20 years.
20  Q  This one was in New Orleans pre-Katrina. Does
21  that ring a bell?
22  A  A lot of them are in New Orleans, unfortunately.
23  Q  Unfortunately.
24  A  I can't separate.
25  Q  He said in a deposition that you and he and your

### 70

1  wives, as you frequently do, all went out to dinner
2  together in New Orleans in 2005, and that you told
3  him during that dinner that based on your pig
4  experiments that you had done under the research
5  funded by TASER, that you were getting cardiac
6  capture. Do you recall that at all?
7  A  I don't recall making that statement at a dinner
8  to him.
9  Q  But if he testified to that, would you have any
10  reason to doubt that that occurred?
11  A  That could well have occurred. It's feasible.
12  Q  Although not in your memory bank anymore, it
13  sounds like something that could have happened; is
14  that correct?
15  A  It's possible. I don't recall having dinner
16  with his wife in New Orleans.
17  Q  Now, you did basically --
18  A  I hope I did not talk about those topics if I
19  and my wife were having dinner with him and his wife.
20  Q  I'm just -- I'm just referring to something that
21  he testified to.
22  A  Okay.
23  Q  But you agree that you did essentially one
24  series of experiments on 13 pigs that resulted in the
25  three papers that have been discussed in this

### 71

1  deposition and also in the earlier deposition,
2  correct?
3  A  That's correct. That's correct.
4  Q  So even though the papers came out in 2006 and
5  then subsequently, I think, through the end of 2007,
6  all the experiments were done at the same time and we
7  struggled a little bit about the date, but you think
8  sometime in 2005 would be a good estimate?
9  A  Yes.
10  Q  And if it was -- if you had mentioned it to
11  Dr. Kroll at the HRS meeting, which was in May, it
12  would have been, let's say, in spring or earlier of
13  2005?
14  A  I imagine so. I have no recollection of that
15  particular conversation so --
16  Q  But you did -- as you were getting the results
17  from your pig studies, you were, as you testified
18  last time in your deposition, keeping the people from
19  TASER informed about your results, correct?
20  A  We had a formal presentation at the end of all
21  of these experimentations. There were TASER
22  engineers at these experimentations to run some of
23  the equipment, so they were informed in that sense.
24  But other than that, if there was some informal
25  conversations with Mark Kroll, I don't recall any of

### 72

1  those.
2  Q  But if it was -- since there were TASER people
3  at the experiments, do you recall who they were by
4  name?
5  A  No, I don't.
6  Q  You felt that TASER knew the findings that you
7  and Dr. Lakkireddy were obtaining from your pig
8  experiments as they were being obtained, correct?
9       MR. MALEY:  Objection.
10       Leading.
11  A  I don't know that. All I know is at the end we
12  did do a formal presentation of all of this data.
13  Q  Well, we went through this last time, and you
14  told Dr. Zipes that from the beginning you were
15  telling the people at TASER the results of your
16  experiments. Do you recall that?
17       MR. MALEY:  Object to form.
18  A  I don't know what you mean by from the
19  beginning. I don't know that I would say from the
20  beginning of the experiment. But from our initial
21  presentation of the data, I would say yes.
22  Q  Okay. And that initial presentation of the
23  data, that was sometime before the 2006 Heart Rhythm
24  Society when you actually presented the paper; is
25  that correct?

Patrick Tchou, M.D.
September 23, 2013

### Page 73

1  A  Yes. That's correct.
2  Q  And I know I asked you this last time, and I
3  remember what your answer was, but can you remember
4  anybody who was there?
5  A  At?
6  Q  At the meeting where you presented your data to
7  the TASER people.
8  A  I knew some of the TASER executives were there.
9  If you mentioned some of the names, I might recall,
10 but I don't recall right now off the top of my head.
11 Q  Well, was Mark --
12 A  And I think Mark Kroll was there.
13 Q  So Mark Kroll was there; is that correct?
14    And that was here at the Cleveland Clinic?
15 A  That's correct.
16 Q  And Rick Smith, the CEO of TASER.
17 A  Yes.
18 Q  He was there?
19 A  That sounds familiar. Yes.
20 Q  Was Steve Tuttle there?
21 A  I don't recall that.
22 Q  Tom Smith, his brother.
23 A  I don't recall whether -- one of the two Smiths
24 were there, at least.
25 Q  And several things were read to you out of your

### Page 74

1  articles, but one thing that was not read to you was
2  the following: "Our data regarding myocardial
3  capture, however, suggests that potential for
4  induction of ventricular tachycardia in subjects with
5  substrate for ventricular tachycardia especially if
6  one of the electrodes were to come within a few
7  centimeters of the myocardium with the other position
8  to direct the current toward the heart. In humans,
9  the anterior apical right ventricular myocardium is
10 closest to the chest wall. Positioning of an
11 electrode in a small thin human in the region of the
12 left nipple with the other electrode near the sternal
13 notch may simulate our position A and could
14 potentially achieve comparable proximity to the
15 electrodes to the heart. Avoidance of this position
16 would greatly reduce any concerns for induction of
17 ventricular arrhythmias."
18    Do you recall publishing that in your paper that
19 was accepted for publication on March 20th, 2006?
20 A  Well, I don't recall the exact wording, but I
21 assume if you're reading from it, that's an accurate
22 description of what we said back at that time.
23 Q  Okay. And can you explain what you mean by a
24 substrate for ventricular tachycardia?
25 A  Any sort of --

### Page 75

1       MR. MALEY:  I'm going to
2  object to the form of the question.
3  These areas were covered the last
4  time the doctor was deposed.
5  A  Any sort of scarring in the heart muscle can
6  potentially form a substrate.
7  Q  Would you include ARVC?
8       MR. MALEY:  Objection to the
9  form of the question. Calls for
10 expert opinion not covered within
11 the material.
12 A  Yes. ARVC creates scarring in the myocardium.
13 Q  And so people are walking around and they don't
14 even know -- and they don't show any visible symptoms
15 of a heart defect, but they have different heart
16 defects including some might have ARVC; is that
17 correct?
18 A  I assume that that's -- there are people walking
19 around like that.
20 Q  And so what you're saying here is that if you
21 shoot somebody so a dart lands in the region of the
22 left nipple and the person has ARVC, they might be at
23 higher risk of having a cardiac arrest.
24      MR. MALEY:  Objection to the
25 form. Leading.

### Page 76

1       MS. DIFRANCO:  Do you need to
2  see the article that he's referring
3  to? No? Okay.
4  A  Yes. What we said was that there's the
5  potential for cardiac capture at a rapid rate, and if
6  they -- if the person has some substrate that would
7  make them susceptible to these rapid ventricular
8  arrhythmias, then they're at higher risk for
9  developing such a thing during the application of the
10 TASER.
11 Q  And that would include -- when you say
12 "developing such a thing," you mean cardiac arrest,
13 correct?
14 A  Yes. That would include cardiac arrest, yes.
15 Q  And when you say a substrate, you're including
16 conditions like ARVC, correct?
17 A  Yes.
18 Q  And anybody who, let's say, has fatty
19 infiltrates or fibrosis or other abnormalities in
20 some of the tissues in the myocardium?
21 A  Scarring specifically.
22 Q  Now, so that's -- since -- a police officer
23 who's looking at a person wouldn't know whether they
24 had this condition or not, correct?
25 A  That's correct.

Page 77

1     MR. MALEY: Object to the
2     form of the question.
3 Q  Were you trying --
4 A  Most likely not.
5 Q  So were you trying to suggest here that maybe it
6 would be better not to aim the darts at the heart?
7     MR. MALEY: Object to form.
8 A  If they had a choice, I would say that that
9 would certainly be something that seems reasonable.
10 Q  And that's what you were trying to communicate
11 when you published this article, correct?
12     MR. MALEY: Object to form.
13     Leading.
14 A  I don't know that I was trying to communicate a
15 particular recommendation at the time, but I was just
16 pointing out a particular vulnerability.
17 Q  And did you point out this same vulnerability
18 when you met with the TASER executives?
19 A  I brought up the fact that there was rapid
20 capture and that there is a potential there for
21 causing arrhythmias.
22 Q  And arrhythmias, do we mean cardiac arrest,
23 among other things?
24 A  Cardiac arrest is generally caused by a form of
25 cardiac arrhythmias.

Page 78

1 Q  Thank you.
2    Now, let's talk about this debate you did in
3 2009 with Dr. Zipes.
4 A  Yes.
5 Q  Does that sort of stick out in your mind?
6 A  Well, it's not too far away that I can recall
7 more of this than older ones.
8 Q  Do you remember there was kind of a big audience
9 for that?
10 A  There was a reasonable size audience, yes.
11 Q  Many of your colleagues from the
12 electrophysiology community were there; is that
13 correct?
14 A  Probably all the people attending that
15 particular conference is from the electrophysiology
16 community.
17 Q  And I've heard estimates that the crowd was over
18 100 for this particular --
19 A  I would say that's reasonable.
20 Q  And are you telling me in this deposition that
21 Dr. Kroll did not assist you in preparing the data
22 for the Power Point, that you did all that yourself?
23 A  I'm sorry. I did -- I made the Power Point
24 myself. Dr. Kroll did help with suggesting certain
25 data that I should look at.

Page 79

1 Q  Okay. Was some of that data --
2 A  He did not physically help me type any of this
3 presentation, if that's what you mean.
4 Q  Okay. But did he give you data like the fact --
5 that one I objected to earlier, the fact that officer
6 injuries and suspect injuries have gone down as a
7 result of TASER use?
8 A  I can't say that I recall specifically what
9 references he suggested for me, but I know that he
10 did send a bunch of references and say look at these
11 as part of your preparation.
12 Q  And after the presentation -- before the
13 presentation -- now, this presentation was given on
14 May 15th, 2009, correct?
15 A  Yes.
16 Q  Okay. Did Dr. Kroll tell you that on April 10th
17 of 2009 there was a boy who had just barely turned 16
18 years old who had been struck in the region of the
19 left nipple with an X-26 dart, had immediately
20 collapsed, was found to be pulseless by the officers
21 as soon as a half minute after his collapse, and then
22 was found to be in ventricular fibrillation by the
23 paramedics when they arrived?
24 A  I don't recall Dr. Kroll telling me about such a
25 case.

Page 80

1 Q  And then on autopsy the toxicology showed
2 nothing but some marijuana and nicotine in his
3 system.
4 A  I don't recall any such conversation.
5 Q  Have you ever heard of a case like that?
6 A  I can't say that I've heard of this particular
7 case, but, you know, I've heard through the news
8 media of various people dying from -- after TASER
9 applications.
10 Q  Well, does that sound -- just based on my
11 description, which is very partial, does that sound
12 like a case that might fit within the criteria that
13 you and Dr. Swerdlow had developed for TASER caused
14 VF?
15 A  It certainly sounds like a possible cause of the
16 sudden death.
17 Q  And would you have appreciated somebody if
18 they -- let's just assume Dr. Kroll knew about this
19 case, and I'm not just making that up. TASER
20 International was called the day it happened. It was
21 April 10, 2009.
22    Do you think, you know, since you were going to
23 get up in front of your colleagues and defend this
24 position about the cardiac safety of the device, that
25 it would have been nice to know that a case like this

Page 81

1  had happened recently?
2      MR. MALEY: Object to the
3      form of the question. Assumes facts
4      not in evidence.
5  A  I'm not sure if it was directly relevant to the
6  particular presentation, but, you know, I did not
7  hear from him at that time, and it would be --
8  Dr. Kroll already knew that I wasn't defending that
9  TASER can never cause arrhythmias, so I don't know
10 that that was an issue.
11 Q  So he was sending you other information in the
12 run up to this presentation you gave, but he didn't
13 include that information. Would that be correct?
14     MR. MALEY: Object to form.
15 A  Yes. He did not send me that, but -- he did not
16 mention that particular case to me at all.
17 Q  But he was sending you --
18 A  That I recall, anyway.
19 Q  But he was sending you other information and
20 saying you might want to include this in your
21 debate.
22 A  Might want to -- yeah. Might want to review
23 these issues.
24 Q  Okay. And so your position is not that a TASER
25 cannot cause VF in a human being if the darts are in

Page 82

1  the chest, correct?
2  A  Yes. That was my position in the debate.
3  Q  I think I've got too many double negatives in
4  there.
5     Is your position that it is possible for a TASER
6  to cause VF in a human being?
7      MR. MALEY: Object to the
8      form of the question. Beyond the
9      scope of the deposition. Previously
10     addressed in the prior deposition
11     testimony.
12 A  So my position was that it is possible.
13 Q  And according to your theory of how that can
14 happen, is it possible only if at least one dart
15 lands in the region of the heart?
16 A  In the region of the chest close to the heart.
17 Q  So under your theory of how this can happen as a
18 possibility, that can be eliminated as a possibility
19 if the darts land, let's say, in the back or in the
20 lower torso or in the abdomen. Would that be
21 correct?
22     MR. MALEY: Object to form.
23     This is not a retained expert by the
24     defendants. It is not disclosed as
25     such.

Page 83

1  A  Based on the experiments we did, it would be
2  highly unlikely to have any directly induced
3  arrhythmias from a TASER dart to the back or other
4  parts of the body other than near the heart.
5  Q  And that -- now, you -- I took your deposition
6  here on July 12th, 2012. Since that time have you
7  done anything in regards to TASERs or electrical
8  control devices other than sit for your deposition
9  today?
10 A  No.
11 Q  Okay. Now, Mr. Maley marked as Exhibit 6 -- and
12 maybe you have it. And I'd like to spend the rest of
13 my time on a few of the slides on this.
14 A  Sure.
15 Q  This is Exhibit 6, and it's a presentation you
16 gave and, actually, I had found this on the Internet.
17 A  Is that right? At the site of the -- is this
18 the Kansas City --
19 Q  Is that what the UK means --
20 A  Yeah.
21 Q  -- University of Kansas?
22 A  Yes.
23 Q  I thought it was in Britain. I'm thinking you
24 went over -- okay.
25    So this refreshes your recollection that it was

Page 84

1  the University of Kansas?
2  A  Yes. I did a presentation at the University of
3  Kansas.
4  Q  And so that would be where your ex -- let's say
5  your ex-protege and very successful former fellow
6  Dr. Lakkireddy is presently.
7  A  Yes.
8  Q  Did he have something to do with inviting you
9  there?
10 A  Yes, he did.
11 Q  And so do you know whether you did this before
12 or after I took your deposition?
13 A  I don't recall. I think it's probably well
14 before, but I'm not sure.
15 Q  Okay.
16 A  I think it's been over two years that I've been,
17 so --
18 Q  Well, one thing that's cited in here is
19 Dr. Zipes's study --
20 A  Yes.
21 Q  -- from Circulation, which I think came out in,
22 if I'm not losing my years here, is May of 2012.
23 A  Okay.
24 Q  So --
25 A  Then it must have been.

**Patrick Tchou, M.D.**
**September 23, 2013**

89

1  A  "TASERs deliver electrical pulses. If these
2  pulses were able to pace the heart at a rapid rate,
3  then arrhythmia induction is a possibility."
4  Q  And is this what you believed to be true?
5  A  Yes.
6  Q  And in your test animals in 2005 you were
7  getting -- were you getting the heart paced at a
8  rapid rate at standard?
9  A  In some instances.
10 Q  Depending on the dart position?
11 A  And depending on the pig.
12 Q  And the very fact that the TASER was causing the
13 heart to be paced at a rapid rate, that raised the
14 possibility of cardiac arrest. Would that be
15 correct?
16 A  There was -- I had a concern that a rapid pacing
17 of the heart can potentially generate heart
18 arrhythmias.
19 Q  And that's based on, let's say, principles of
20 electrophysiology as you understand them?
21 A  That's correct.
22 Q  Now, if you could go to the next one, I don't
23 have an extra, but it's 11, and I'd like to hold it
24 up just on video just so we can see what it is. Can
25 I hold it out here? Maybe if you could just explain

90

1  this.
2  A  Are you asking me the question?
3  Q  Yes.
4  A  This is a graph showing the standard pacing
5  output that a typical pacemaker would put out and its
6  relationship to capture the heart with a pacing
7  impulse.
8  Q  And how does it relate to what you're expressing
9  here?
10 A  Well, I was presenting this presentation to an
11 audience that may not be all familiar with these
12 basic principles of cardiac pacing, so I was
13 explaining what cardiac pacing capture is and what is
14 necessary to capture the heart and that because I was
15 going to start talking about electrical impulses from
16 the TASER, I wanted to have some background
17 information for the audience to understand that
18 these -- what is the relationship between current and
19 pulse width and so on.
20 Q  I'd like to invite your attention now to slide
21 number 30.
22 A  Okay. 30. Okay.
23 Q  Okay. And can you just -- without reading it,
24 just describe what it is that you're saying here in
25 just summary?

91

1  A  With that position one that we tested in the
2  pigs from the sternal notch to the point of maximum
3  impulse, the initial testing was done with the two
4  barbs that way and so we wanted to know whether there
5  was an influence in the barbs separation along that
6  line on capture of the heart. That is what this
7  particular slide indicates.
8  Q  Then 31, is that a bar graph showing the
9  results?
10 A  That's correct.
11        MR. BURTON:   And I'd like to
12    mark this -- this can be marked
13    6-31.
14         -----
15    (Plaintiff's Exhibit 6-31 was
16    marked for identification.)
17         -----
18 BY MR. BURTON:
19 Q  So which dart is moving, the upper dart or the
20 lower dart as you're gesturing there?
21 A  The chart indicates two different movements, so
22 one is -- the purple is indicating moving the dart
23 from the PMI up towards the sternal notch, and the
24 maroon color is indicating moving the upper dart
25 towards the PMI.

92

1  Q  And in both cases, if I'm reading this right,
2  between 7 and a half centimeters and 15 centimeters
3  separation between the electrodes, you got cardiac
4  capture every time?
5  A  That's correct. There was some -- some cardiac
6  capture occurred every time when you have those kinds
7  of separations.
8  Q  In fact, if you look at 32, which are your
9  conclusions -- and I'm sorry, I don't have a
10 separation -- could you read your first conclusion
11 there, please, on page --
12 A  "While VF is not induced at standard outputs
13 from the TASER, our findings were in contrast to the
14 prior study in pigs which showed an over 15x safety
15 margin for the induction of VF."
16 Q  And so the prior study that you're referring to
17 was the one that you testified earlier that was in
18 pace that was done by -- I think it was called the
19 McDaniels study?
20 A  That's correct.
21 Q  And they found 15 times safety margin, but you
22 found as low as a three times safety margin; is that
23 correct?
24 A  That's correct.
25 Q  And then can you read your third bullet point

Patrick Tchou, M.D.
September 23, 2013

## 93

1  there, please?
2  A  "Location of the dart on the chest and its
3  electrical proximity to the heart plays an important
4  role in whether the TASER pulse has captured the"
5  heart, I think.
6  Q  Yeah. I think you meant heart.
7  A  Missed it. Yeah.
8  Q  And so is that something that you believe to be
9  true since you've done the pig experiments?
10 A  Yes.
11 Q  And that's something that you shared with TASER
12 prior to publication of your papers?
13 A  Yes.
14 Q  And can you read your last bullet point there?
15 A  "Of significant concern, rapid capture was very
16 common at standard output of the TASER at rates we
17 commonly associate with potential induction of VF."
18 Q  Can you explain -- let's say you're explaining
19 this to a non-medical audience -- exactly what you're
20 saying there?
21 A  Well, when you pace the heart at, say, rates
22 above 200 beats per minute or 250 to 300 beats per
23 minute, you have the potential of inducing
24 ventricular fibrillation.
25 Q  And that's what you were getting with the

## 94

1  standard output of the TASER when it was --
2  A  In some cases. Certainly not in all the cases.
3  Q  But the one constant that your experiments were
4  showing -- is it correct, Doctor? -- is that this
5  happens when the darts are near the heart and when
6  they're away from the heart on another part of the
7  anatomy it doesn't happen?
8  A  That's correct.
9  Q  And, again, this is something that you were
10 sharing with TASER?
11 A  Yes. I believe we shared that the proximity to
12 the heart was an important variable in capture.
13 Q  And that would be prior to the Heart Rhythm
14 Society meeting in 2006 when you formally presented
15 your paper?
16 A  That's correct.
17 Q  Now, then if you go to 33, you mentioned should
18 the studies be done in humans instead of pigs. And
19 you would like to have some human data on this; is
20 that correct?
21 A  That would be nice.
22 Q  And then you mention in 34 and 35 the
23 Nanthakumar study which coincidentally was released
24 virtually simultaneously with yours, correct?
25 A  Yes.

## 95

1  Q  And neither of you apparently knew what the
2  other was doing.
3  A  Correct.
4  Q  Okay. And are you critical of their study or
5  their methodology or their conclusions?
6  A  No. I don't think so.
7  Q  Do you think as a doctor and as a scientist that
8  we can look at your study and their study together
9  and understand better the medicine and the physiology
10 of this?
11 A  I think their study contributed to some extent
12 to our understanding, yes.
13 Q  And there's nothing that is contradictory
14 between your study their study. Would you agree with
15 that?
16 A  Yeah. I don't think they're necessarily
17 contradictory.
18 Q  I mean, you did five second discharges, they did
19 longer discharges. You had a scalable device where
20 you could increase the power, they used only standard
21 devices. They used epinephrine on some pigs, you
22 didn't. And then we have a variety of findings,
23 correct?
24 A  That's correct.
25 Q  Okay. And then would you say, without going

## 96

1  through any more, the same thing about the Walters
2  study that you referred to on 36 and 37?
3  A  Yeah.
4  Q  Okay. We don't need to -- now, I'd like to jump
5  to page 55. I'm sorry. Let me go to page 53, and
6  this is where you cite Dr. Zipes's article.
7  A  Yes.
8  Q  Okay. And this is another way to -- you have
9  great respect for Dr. Zipes; is that correct?
10 A  I do.
11 Q  And did you have any concerns or questions about
12 his study or his methodology which was obviously
13 totally different than yours?
14 A  I don't recall the details already of this. I
15 haven't reviewed this paper recently, but I don't
16 recall any strong objections to the case reports that
17 he had mentioned, that he brought in.
18 Q  This is in your Power Point slides. You're
19 presenting it, let's say, not critically, but
20 uncritically as something that's adding to our
21 knowledge in this area?
22 A  Yes. Correct.
23 Q  Okay. And just for your information,
24 Mr. Mitchell is one of the cases here, he's case
25 number 7, and that's the case that we are here on

Patrick Tchou, M.D.
September 23, 2013

### 97

1  today, the one I was mentioning, and he actually
2  weighed 128 pounds. Were you more concerned that
3  this could happen to a thin human being, that there
4  would be capture that might lead to an arrythmia?
5       MR. MALEY:   Objection to the
6       form of the question. To the extent
7       it implies that he was a thin human
8       being, contrary to the evidence in
9       the record.
10  A  Well, the thinner a person, obviously closer the
11  heart is to the chest and chest wall, so yes, there
12  is more concern with thin people than there is with
13  some obese people.
14  Q  And would you consider somebody who is 5,3 and
15  128 pounds to be thin?
16  A  I don't know how to answer that.
17  Q  Okay.
18  A  He's probably at his ideal weight.
19  Q  Everybody else is fat, right?
20       Okay. So 54 you talk about what is the
21  denominator. So I assume that by what is the
22  numerator, the number of people that this has
23  happened to, that has had cardiac arrest due to
24  cardiac capture due to darts in the chest, and the
25  denominator you're suggesting here is what is the

### 98

1  total number of people who have been tazed.
2  A  Yes.
3  Q  Okay. But is there a national registry that we
4  can go to to get this data?
5  A  Unfortunately not. I don't think there's a
6  national registry.
7  Q  It would be good if there was, correct?
8  A  I think it would be.
9  Q  And so we're relying here on figures that are
10  maybe from the manufacturer based on sales of darts
11  or something?
12  A  I don't know what the data that was used, but
13  they do have data and tips of usage of the device.
14  Q  Well, where did you get this data that's on 54?
15  A  I think this is from the manufacturer.
16  Q  Is this from Dr. Kroll?
17  A  I'm not sure if it was directly from Dr. Kroll
18  or not, but I think it is from -- these are TASER
19  data.
20  Q  Okay. And the numerator would be the number of
21  people who die or at least have cardiac arrest --
22  because it's possible to be resuscitated, correct?
23  A  Yes.
24  Q  Okay. And -- after TASER darts to the chest?
25  A  That's correct.

### 99

1  Q  So do you have a reliable number on what that
2  numerator is?
3  A  I don't think we have a reliable number, but it
4  would be from -- the best we can gather from police
5  reports and so on.
6  Q  And media reports and --
7  A  Yes.
8  Q  -- Google alerts and everything?
9  A  Sure.
10  Q  Okay. So -- and then -- so if we looked at just
11  the numerator as the number of people that this
12  happened to and the denominator as the number of
13  people who were hit in the chest with darts, that
14  would be different than what you're saying here,
15  correct?
16  A  Yes.
17  Q  Because the denominator here on 54 is including
18  people hit in the back and alligator clips during
19  training and all of that.
20  A  I don't know about alligator clips during
21  training, but yes, this would include all hits.
22  Q  Okay. Now, 55 --
23       MR. BURTON:   And I'll have
24       this marked as 6-55.
25       - - - - -

### 100

1       (Plaintiff's Exhibit 6-55 was
2       marked for identification.)
3       - - - - -
4  BY MR. BURTON:
5  Q  Here you're answering a rhetorical question,
6  Doctor; is that correct?
7  A  That's correct.
8  Q  Why are these sudden deaths so infrequent?
9  A  Yes.
10  Q  And could you read what number two is?
11  A  "There are relatively small areas of the chest
12  where a dart hit can potentially generate high enough
13  current density at the myocardial surface to generate
14  rapid capture."
15  Q  And you've known that to be true since you did
16  your animal experiments in 2005; is that correct?
17  A  I think that from the data from the animal
18  experiments led me to suspect that there's some area
19  around the chest that this can occur, and the data
20  from the CT study indicates to me that that's a
21  relatively small area where that would be in humans
22  in terms of distances.
23  Q  And so could you just with your finger, because
24  you're on video here, just illustrate for us a couple
25  times so it's real clear to somebody who looks at the