```
 1        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2              IN AND FOR THE COUNTY OF SANTA CRUZ
 3
    DAVID BUTLER as Conservator of the)
 4  Person and Estate of STEVEN ALAN  )
    BUTLER,                           )
 5                                    )
              Plaintiff,              )
 6                                    )
    vs.                               ) No. CV161436
 7                                    )
    TASER INTERNATIONAL, INC.; PROFORCE)
 8  MARKETING, INC., and DOES 1 through)
    20, inclusive,                    )
 9                                    )
              Defendants.             )
10                                    )
11
12
13
14        VIDEOTAPED DEPOSITION OF PATRICK WALLER SMITH
15
16
17                      Phoenix, Arizona
                        February 25, 2010
18                         8:14 a.m.
19
20
21  PREPARED FOR:
22  (copy)
23  PREPARED BY:
    Kristy A. Ceton, RPR
24  AZ Certified Court Reporter No. 50200
25
```

Page 5

1                          Phoenix, Arizona

                           February 25, 2010

2                          8:14 a.m.

3              TRANSCRIPT OF PROCEEDINGS

4              THE VIDEOGRAPHER: Good morning. We are

5   on the record. This is media No. 1 of the videotaped

6   deposition of Patrick "Rick" Smith taken by the

7   plaintiff in the matter of David Butler versus TASER

8   International Incorporated, et al., Case No. CV161436

9   filed in the Superior Court of the State of

10  California for the County of Santa Cruz. Today is

11  February 25, 2010, and the time is approximately 8:05

12  a.m.

13             MR. BURTON: Look. It's 8:15.

14             THE VIDEOGRAPHER: I apologize. The time

15  is approximately 8:15 a.m.

16             This deposition is taking place at Driver

17  and Nix Court Reporters, 3131 East Clarendon Avenue,

18  Suite 108, Phoenix, Arizona 85016. Your certified

19  reporter is Kristy Ceton and Sarah Crider is your

20  certified legal videographer, both appearing on

21  behalf of Driver and Nix Court Reporters.

22             Please note that microphones are

23  sensitive and may pick up whispers.

24             Would counsel please identify yourselves

25  and state which party you represent.

1  did not cause cardiac arrest or cardiac problems.
2  The exact wording, you know, obviously I would want
3  to see the document. There have been many versions
4  of training, and I don't have them memorized
5  verbatim.
6      Q.  Well, when you were training these police
7  officers that are using your device on human beings
8  that this testing you're referring to showed safety
9  margins, did you also tell these officers that the
10 risk of cardiac arrest from Tas'ing someone in the
11 chest could not be eliminated or was not zero?
12     A.  I believe the way it was characterized in
13 the training is that the possibility of inducing
14 ventricular fibrillation was extremely low was the
15 language that was used, which is nonzero, but
16 extremely low.
17     Q.  So is it your understanding that this
18 risk of creating or causing cardiac arrest increases
19 with the dart position closer to the location of the
20 heart in the front of the chest?
21     A.  I would agree that in animal studies, it
22 has been shown that the closer the darts are to the
23 heart, the more the probability that there may be
24 cardiac stimulation.
25     Q.  And when did you start warning police

1  officers of that?
2        MS. GIBEAUT: Object to form.
3     Q. BY MR. BURTON: Well, okay. I'll
4  rephrase.
5        When did you first come to that
6  realization?
7     A. I don't recall the exact time period, but
8  -- I don't recall the exact time period.
9     Q. Well, roughly what year?
10    A. I don't recall the time period.
11    Q. Well, was it last year?
12    A. Certainly by last year we were aware that
13 in animal studies, if the darts are away from the
14 heart, the risk in that case, I think, could be
15 quantified to -- Again, even then, I don't think you
16 can ever quantify it as zero. But certainly by 2009,
17 we were aware that the dart-to-heart distance was a
18 factor in terms of safety margins.
19    Q. Did you know that in 2005?
20    A. Again, I would have to see when various
21 studies were published to put a date on it.
22    Q. Well, which study would you have to see
23 when it was published?
24    A. I think the first study that discussed
25 the topic of dart-to-heart distance may have been

1  John Webster's work out of Wisconsin.

2  Q.  Well, how about Dr. Lakkireddy and Dr.
3  Tchou's work on the pigs that were under the
4  influence of cocaine?

5  A.  Yes.  They also demonstrated that the
6  safety margins were higher when the darts were
7  further away from the cardiac access.  However, I
8  think it also is important that they demonstrated
9  there was a significant safety margin, even in the
10 worst case position of the electrodes.

11 Q.  Well, in the worst case positioning of
12 the electrodes, they got cardiac capture with
13 five-second cycles, correct?

14 A.  Correct.

15 Q.  With standard X-26 current, correct?

16 A.  I believe so.  On at least some of the
17 test subjects.

18 Q.  And we're talking about the TASER-funded
19 study or at least partially funded by TASER that was
20 released in early 2006, correct?

21 A.  Correct.  Well, again, I -- I hesitate to
22 confirm the date for that.  I want to obviously look
23 at the document.  I don't know exactly when these
24 studies were published, but that was a study that was
25 funded by TASER.

1  Q.  Now, prior to the initial release
2  publicly of that data, were you told anything by any
3  of the doctors that were involved in that research,
4  that your company was partially funding, about what
5  their results were?
6  A.  I believe there were some discussions
7  with some of the researchers. I can't recall if it
8  was in the context of -- what the context of the
9  conversation was, but I believe we did have
10 discussions about the results.
11 Q.  And would that include discussions with
12 Dr. Patrick Tchou, T-c-h-o-u?
13 A.  I don't believe at the time I had
14 personal conversations with Dr. Tchou. My
15 conversations, I believe, were secondhand through
16 either Mark Kroll or possibly Andrew Hinz.
17 Q.  H-i-n-z?
18 A.  I believe so.
19 Q.  Did you ever discuss these preliminary
20 test results with Dr. Lakkireddy,
21 L-a-k-k-i-r-e-d-d-y?
22 A.  I may have, but, for the most part, I
23 believe the interchange was happening with Dr. Kroll
24 who heads our advisory board.
25 Q.  So your understanding would be that Dr.

1  Tchou or Dr. Lakkireddy or one of the other
2  researchers would talk to Dr. Kroll and then Dr.
3  Kroll would speak to you about it?
4       A.   In generalities.
5       Q.   Well, what did Dr. Kroll tell you?
6       A.   The discussion centered primarily around
7  the effects of cocaine.  The primary focus of the
8  study at Cleveland was to look into whether or not
9  cocaine affected the ventricular fibrillation
10 threshold.
11           And the general results of the study that
12 were conveyed to me was that there were no events of
13 ventricular fibrillation in any configuration of the
14 probes -- that the introduction of cocaine actually
15 increased the safety margin or the ventricular
16 fibrillation threshold and the positioning of darts
17 away from the chest area also increased the safety
18 margins.
19      Q.   Did Dr. Kroll tell you before the study
20 was actually publicly released that the researchers
21 had told him that they had documented cardiac capture
22 in the test animals with a standard X-26 current when
23 the darts were placed across the chest where the
24 heart is?
25      A.   I believe so.  There were general

1   discussions on the -- on the results and I think we

2   discussed most of the key elements that were in the

3   paper.

4       Q.   And that would be how soon after the

5   study started would you estimate?

6       A.   That, I don't know.  It's been five

7   years.

8       Q.   But this was some time around the end of

9   19- -- I'm sorry.  The end of 2005, the beginning of

10  2006?

11      A.   In that time frame, yes.

12      Q.   And what steps did TASER International

13  take during that time frame to inform its users,

14  specifically in law enforcement, that research had

15  disclosed that the risk of cardiac capture may

16  increase with dart positions that are close to the

17  heart?

18      A.   The study itself, as soon as it was

19  released, was placed in our compendium.  I believe it

20  was placed on our website for publication and I

21  believe it was included in some of Dr. Kroll's

22  presentations that he would do at varying times

23  around the country on the topic of TASER effects.

24           I don't recall if we were doing chiefs'

25  courses back then that we do today -- courses that

1  Q.  BY MR. BURTON: I don't mean to be rude
2  or anything, but I didn't ask you what TASER did as
3  follow-up for this or why they didn't tell officers
4  about this finding. I just wanted to first establish
5  the following.
6      In late 2005 or early 2006, TASER found
7  out from researchers on a project that TASER
8  partially funded that the dart position on the test
9  animals affected the rate of cardiac capture,
10 correct?
11     A.  Yes, the position of the electrodes did
12 have an effect on thresholds for -- be it for capture
13 or fibrillation.
14     Q.  Okay. So my question is, other than what
15 you've already testified to about putting the study
16 and the research compendium and having Dr. Kroll
17 speak to the chiefs of police and so forth, what else
18 did TASER do, let's say during the year 2006, to
19 inform its users and consumers in the law enforcement
20 community that it now had test results that showed
21 that the location of the darts on its test -- on test
22 animals affected the possibility of cardiac capture?
23     A.  Again, as I mentioned, the studies were
24 released, and we discussed this topic with our
25 medical advisory board, and their advice was that

Case: 4:11-cv-00790-RWS   Doc. #: 85-15   Filed: 07/16/14   Page: 10 of 11 PageID #: 1188

1  there was -- there was not any -- This did not merit
2  any changes in training or procedure. So the study
3  was released. It was discussed publicly, but it did
4  not impact training.
5      Q.  Please name every member of the medical
6  advisory board that TASER relied on in its decision
7  not to, as you said, impact training with this new
8  information.
9      A.  Mark Kroll, Dr. Rick Luceri, Dr. Neil
10 Hawkins, Dr. Robert Stratbucker. Dr. Jeff Ho is not
11 on the advisory board but is someone who has
12 consulted on safety issues. Dr. Charles Swerdlow,
13 Dr. James Sweeney. And I believe discussions also
14 included Drs. Lakkireddy and Tchou, who had performed
15 the study.
16     Q.  So the individuals that you just listed,
17 it's your testimony that they were specifically in
18 these discussions following the information acquired
19 late 2005, early 2006, that dart location on test
20 animals affected the rates of cardiac capture?
21     A.  Yes.
22     Q.  Okay. And was there -- there was some
23 difference of opinion among this group of doctors?
24     A.  I don't believe so.
25     Q.  Well, hasn't Dr. Swerdlow's position been

Page 264

1        CERTIFICATE
2
3        I, Kristy A. Ceton, Certified Court
4   Reporter for the State of Arizona, certify:
5        That the foregoing deposition was taken
6   by me; that I am authorized to administer an oath;
7   that the witness, before testifying, was duly sworn
8   by me to testify to the whole truth; that the
9   questions propounded by counsel and the answers of
10  the witness were taken down by me in shorthand and
11  thereafter reduced to print by computer-aided
12  transcription under my direction; that deposition
13  review and signature was requested; that the
14  foregoing pages are a full, true, and accurate
15  transcript of all proceedings and testimony had upon
16  the taking of said deposition, all to the best of my
17  skill and ability.
18       I FURTHER CERTIFY that I am in no way
19  related to nor employed by any of the parties hereto
20  nor am I in any way interested in the outcome hereof.
21       DATED this 8th day of March, 2010.
22
23       _____
         Kristy A. Ceton
24       Certified Court Reporter No. 50200
         For the State of Arizona
25