EXHIBIT "O"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CASE NO.  4:11-CV-00790

GWENNETTE WILSON,

    Plaintiff,

    v.

ST. CHARLES COUNTY, DEPUTY MATT
HOWZE, Individually and as Deputy
Sheriff of St. Charles County, and
TASER INTERNATIONAL, INC.,

    Defendants.

_____/


VOLUME II OF II

Embassy Suites - Fort Lauderdale
1100 Southeast 17 Street
Fort Lauderdale, Florida 33316
April 18, 2014
9:06 a.m. - 2:33 p.m.


VIDEOTAPED DEPOSITION OF DOCTOR RICHARD LUCERI, M.D.


Taken before Jeri Nupp, Court Reporter and Notary Public in and for the State of Florida at Large, pursuant to a Notice of Videotaped Deposition, filed in the above-styled case.

Page 4

```
 1        THE VIDEOGRAPHER:  We are now on the record in
 2   the matter Wilson v. St. Charles County, et al.
 3   Today's date is April 18, 2014.  The time is 9:06 a.m.
 4   This is the videotaped deposition of Ricard Luceri,
 5   M.D. being taken at Embassy Suites 1100 Southeast 17th
 6   Street, Fort Lauderdale, Florida.  My name is Brian
 7   Terrinoni, I'm the videographer.  The court reporter is
 8   Jeri Nupp.  Will counsel please introduce yourselves
 9   for the record.
10        MR. WILLIAMSON:  Peter Williamson, appearing on
11   behalf of the plaintiff along, with my co-counsel Jim
12   Leonard.
13        MR. BRAVE:  Michael Brave for defendant TASER
14   International Incorporated.
15        THE VIDEOGRAPHER:  Swear in the witness.
16               RICHARD LUCERI, M.D.
17   Having been first duly sworn or affirmed, was examined and
18   testified as follows:
19        THE WITNESS:  I do.
20               DIRECT EXAMINATION
21   BY MR. WILLIAMSON:
22    Q    Good morning, Doctor Luceri.  I introduced myself
23   off the record; I'll do it again on the record.  My name is
24   Peter Williamson.  I represent along with Jim Leonard,
25   Gwennette Wilson, the plaintiff in this case.  You've had
```

1     Q    Okay. Let's talk about the two and a half to
2 three minutes. Where did you get that statement from?
3     A    From the timeline that -- there was a sheriff's
4 department timeline that was reconstructed on -- on the
5 events there.
6     Q    Okay. What do you understand the time gap to be
7 between the last TASER discharge, the fourth discharge, and
8 when Deputy Bell arrived at the scene?
9     A    When he arrived at the scene?
10    Q    Right.
11    A    Well, it was shorter than this amount of time. I
12 don't know exactly. I believe it was under -- under two
13 minutes.
14    Q    Do you see that anywhere in your report?
15    A    No, it's not in my report. I didn't put a, you
16 know, a line by line. You know, it was a summation of that
17 timeline that I read that was reconstructed. I was trying
18 to get an idea of the timing of the last TASER shot and when
19 he noticed that there was a change in the physical findings.
20    Q    Right. And -- and according to your testimony,
21 that's a critical fact in this case because that's the
22 primary thing you're focused on is the time between the
23 discharge and when the cardiac arrest occurred, right?
24         THE WITNESS: That's correct.
25         MR. BRAVE: Objection, form.

1    that type of research to fibrillation research and
2    convince me that the pig is a -- is a surrogate for
3    humans.  You just can't.  I refuse to buy that.
4  BY MR. WILLIAMSON:
5    Q    Okay.  Are -- are you aware that after conducting
6  research that was funded by TASER International, Patrick
7  Tchou had a meeting with various representatives of TASER
8  including Mark Kroll; are you aware of that?
9    A    No.
10        MR. BRAVE:  Objection, form.
11  BY MR. WILLIAMSON:
12    Q    Mark Kroll's never come to you and told you about
13  any conversations he had with Patrick Tchou?
14        MR. BRAVE:  Objection, form.
15        THE WITNESS:  I don't recall any, no.
16  BY MR. WILLIAMSON:
17    Q    Okay.  Are you aware that Patrick Tchou, after he
18  did research funded by TASER, that he advised TASER that the
19  possibility of inducing ventricular arrhythmia is there?
20        MR. BRAVE:  Objection, form.
21        THE WITNESS:  I'm not aware of that.  I'm not
22  aware -- I'm not privy to his conversations with TASER.
23  BY MR. WILLIAMSON:
24    Q    Is Patrick Tchou known as a -- a respected
25  electrophysiologist?

```
1     A     Yes, he is.
2     Q     Okay.  Prominent electrophysiologist?
3     A     I would say so.
4     Q     Okay.  So would it be of interest to you as a
5  member of the scientific and medical advisory board to know
6  that he had, in 2005 or '06, advised TASER that the
7  possibility of inducing ventricular arrhythmia in humans
8  was -- was possible?
9               MR. BRAVE:  Objection, form.
10              THE WITNESS:  He's not the only one.
11 BY MR. WILLIAMSON:
12    Q     I -- I don't care about anybody.  I'm asking you
13 that question, Doctor.  If you could answer that question.
14 Would it be of interest to you to know that Doctor Tchou
15 went to the company and advised them, based on the research
16 he had conducted, that the possibility of inducing
17 ventricular fibrillation from a TASER electronic control
18 device existed?
19              MR. BRAVE:  Objection, form.
20              THE WITNESS:  I -- yes, I would be interested in
21 that.  But you -- you cautioned me earlier this morning
22 that you are not interested in possibilities, but
23 probabilities.  Those are your words, not mine.  So now
24 you're interested in possibilities; am I correct?
25
```

```
 1   BY MR. WILLIAMSON:
 2       Q    Well, I -- it's not what I'm interested in.  I'm
 3   asking were you aware of that?  It's a simple question.
 4            MR. BRAVE:  Objection, form.
 5            THE WITNESS:  You're asking me if I would be aware
 6       of -- or I would be interested in -- in that?
 7            MR. WILLIAMSON:  In knowing that.
 8            THE WITNESS:  Absolutely.
 9            MR. BRAVE:  Objection, form.
10            THE WITNESS:  Absolutely.  Interested in knowing
11       the possibility, yes.  But you tell me earlier that
12       you'd rather deal in probabilities and not
13       possibilities.
14   BY MR. WILLIAMSON:
15       Q    So as a member of the scientific and medical
16   advisory board, to your recollection you were never trol --
17   told that Patrick Tchou had made that statement to TASER?
18       A    I'm --
19            MR. BRAVE:  Objection, form.
20            THE WITNESS:  -- not aware of it.  I don't
21       remember if it was said.
22   BY MR. WILLIAMSON:
23       Q    Are you aware that Patrick Tchou told TASER
24   International that the safety margin of a X26 would increase
25   if the dart locations were further away from the chest or --
```

```
 1    or the heart?
 2              MR. BRAVE:  Objection, form.
 3              THE WITNESS:  No, I am not aware of that.
 4    BY MR. WILLIAMSON:
 5         Q    In any of the pig studies that you reviewed, did
 6    ventricular fibrillation result from a standard X26
 7    discharge?
 8         A    Yes.
 9         Q    Do you remember which study that was?
10         A    Well, there were a couple I cited in my report.
11    But I can summarize all of those pig studies very easily in
12    saying that they don't represent -- they don't represent
13    human interactions and human conditions especially.
14         Q    If -- if you can't do human research in this area
15    because it's unethical, how do you then try to establish
16    scientifically that this phenomena can occur?  The phenomena
17    of either capture or ventricular fibrillation.  How -- how
18    do you establish that?
19         A    That's a very good question.  You -- you select
20    animals that more likely resemble humans.  Not a pig that
21    has a very sensitive heart to start with.
22         Q    Okay.  What kind of animals are we talking about?
23         A    Well, number one, I'm not an animal researcher,
24    so, you know, that's not my field.  But dogs, bovines, cows,
25    there are other animals that I'm sure have better
```