IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
NO.: 3:10-CV-125

TAMMY LOU FONTENOT, as )
Administratrix of the Estate )
of DARRYL WAYNE TURNER, )
deceased, )
                                )
          Plaintiffs,            )
                                )
     -vs-                        )
                                )
TASER INTERNATIONAL, INC.,       )
                                )
          Defendant.             )
                                )

ORAL AND VIDEOTAPED DEPOSITION OF
DOUGLAS EARL KLINT
Phoenix, Arizona
October 29, 2010
10:18 a.m.

REPORTED BY:
Jacquelyn A. Allen, RPR
AZ Certified Reporter No. 50151

```
 1   defendant TASER International, Incorporated.
 2            THE VIDEOGRAPHER:  Thank you.
 3            Would the reporter please swear in the witness.
 4
 5                     DOUGLAS EARL KLINT,
 6   called as a witness herein, having been first duly
 7   sworn, was examined and testified as follows:
 8
 9                     E X A M I N A T I O N
10   BY MR. BURTON:
11       Q.   And could you state your complete name for the
12   record, please.
13       A.   Douglas Earl Klint.
14       Q.   And what is your current position, job title,
15   with TASER International, Inc.?
16       A.   President and general counsel.
17       Q.   And I understand, Mr. Klint, that you're an
18   attorney and that you advise TASER on legal matters.
19   I'm an enthusiastic supporter of the attorney/client
20   privilege, and I certainly want to respect it in the
21   course of the deposition here today.  So to the extent,
22   you know, you can, sort of help me do that as I ask you
23   questions.  I know there's meetings with a lot of
24   people, and if we can get, you know, the borders set as
25   we go through the questioning, and feel free to kind of
```

```
1            (Recessed from 12:33 p.m. until 12:53 p.m.)
2            THE VIDEOGRAPHER:  This is the beginning of
3   tape number 3 of the video deposition of Douglas Klint.
4   The time is 12:53 a.m. -- I'm sorry, p.m. -- 12:53 p.m.
5       Q.   BY MR. BURTON:  Mr. Klint, now I'd like to
6   switch to the other area, which is warnings.  And when
7   did you first become involved in the product warnings?
8       A.   Probably soon after I joined TASER.
9       Q.   And have you been involved in the product
10  warnings ever since?
11      A.   I have.
12      Q.   My first question to you is, at any time prior
13  to the date of this incident, which is March 20th, 2008,
14  did TASER warn its users that applying dart mode to the
15  chest of a human being could potentially cause a cardiac
16  arrest?
17      A.   We did not.
18      Q.   Did -- at any time prior to March 20th, 2008,
19  did TASER ever warn that a longer-duration exposure
20  would raise the risk of causing a cardiac arrest?
21      A.   My recollection is that we had a warning to
22  minimize extended durations.  I don't recall
23  specifically when that warning was added.
24      Q.   And what was the logic behind that warning?
25      A.   The logic behind that warning was that our
```

```
 1   objective with our police officers is to encourage them
 2   to use the minimal force necessary in using the TASER
 3   device to control a criminal suspect, and we were seeing
 4   situations in the field where officers were holding the
 5   triggers down for a long period of time.  Sometimes they
 6   weren't even aware they were doing it.
 7           And we wanted to remind them that they should
 8   be only using the amount of force necessary and warning
 9   against -- encouraging them to minimize the amount of
10   duration was consistent with that.
11       Q.  Was the thinking that by minimizing the extent
12   of duration, or warning to minimize the extent of
13   duration, that that would minimize the risk of causing
14   cardiac arrest?
15       A.  No, that was not a consideration.
16       Q.  And I think this goes from -- follows from your
17   prior answer, but I just would like to get a separate
18   answer on it:  Prior to March 20th, 2008, TASER did not
19   warn that decreasing the distance from the dart to the
20   heart could increase the probability of cardiac arrest;
21   is that correct?
22       A.  That decreasing the distance from heart to dart
23   would increase the probability of cardiac arrest?
24       Q.  Well, let -- or -- right.  TASER did not warn
25   about that?
```

```
 1          A.   No, we did not warn about that.
 2          Q.   Or the converse, increasing the distance from
 3     the dart to the heart would decrease the risk of cardiac
 4     arrest?
 5          A.   Right, and the answer to that is no.
 6          Q.   Now, this has to do with a feature of the X26
 7     which you just referred to, which is that if the trigger
 8     is held down by the operator, the discharge continues
 9     until the trigger is released past the five-second
10     cycle.  Were you ever party to a discussion in your
11     company about the feasibility of changing that feature
12     so that it would automatically shut off after five
13     seconds?
14          A.   It has come up for discussion.  I can't tell
15     you specifically when.  It was quite a while ago.
16               And the concern expressed by our Training
17     Advisory Board and by our training staff was that
18     putting any kind of automatic cutoff on would put law
19     enforcement officers at risk when they're subduing a
20     violent criminal suspect.
21          Q.   Was there a discussion that the -- at least one
22     version of your -- I guess your erstwhile competitor,
23     Stinger system, had that feature?
24          A.   I was aware that they were advertising that
25     feature.  I don't have any personal knowledge whether or
```

```
 1   chest.
 2           MR. BURTON:  Okay, thank you.
 3           Now, let me go ahead at this point and mark as
 4   Exhibit 3, it's a memo that was put out October 15th,
 5   2009.
 6           (Marked for identification Deposition
 7   Exhibit 3.)
 8       Q.  BY MR. BURTON:  Mr. Klint, are you familiar
 9   with this memo?
10       A.  Yes, I am.
11       Q.  Do you know who wrote it?
12       A.  I believe we all had a hand in writing it.  I'm
13   not sure if I was the primary author on this document or
14   not, but I may have been.
15       Q.  When you say "we" all had a hand in it, could
16   you just list everybody who had a hand in it?
17       A.  I believe our litigation team did, Rick Smith
18   probably had a hand in writing this, or reviewing it and
19   editing it.  And those would be the people that I'm --
20   oh, and Rick Guilbault also.
21       Q.  And he's the signatory?
22       A.  Correct.
23       Q.  I'd like to just ask you about a few of the
24   passages in here.  It says, "Why was the preferred
25   target zone changed?  The answer ... has less to do with
```

```
 1    TASER device can cause ventricular fibrillation or
 2    cardiac arrest.
 3        Q.  So you do believe, at least as of the time that
 4    this memo came out, that a TASER shot to the chest of a
 5    human being can result in cardiac capture?
 6        A.  Yes.
 7        Q.  But is it your understanding that regardless of
 8    the length of time that the TASER is discharged, that
 9    cardiac capture cannot turn into ventricular tachycardia
10    or ventricular fibrillation?
11            MR. BRAVE:  Objection; form.
12            THE WITNESS:  I'm not a medical expert, but
13    based on the advice that we have received from people
14    knowledgeable in this area, that it's our belief that
15    you would have to be out -- you'd have to have a very
16    high rate of capture for approximately 90 seconds or
17    more before capture could deteriorate to ventricular
18    fibrillation.
19        Q.  BY MR. BURTON:  Is that based on research --
20    recent research performed by Dr. Kroll?
21        A.  In part, yes.
22        Q.  Now, if we go to the next page, it says -- it's
23    a question:  "Can I still deploy my TASER ECD into the
24    chest?"  Then there's an answer, "Yes."  This is the
25    language that you were referring to earlier in your
```

```
 1                    CERTIFICATE
 2            I, Jacquelyn A. Allen, Certified Reporter for
 3   the State of Arizona, certify:
 4            That the foregoing deposition was taken by
 5   me; that I am authorized to administer an oath; that
 6   pursuant to A.R.S. Section 41-324(B), the witness before
 7   testifying was duly sworn by me to testify to the whole
 8   truth; that the questions propounded by counsel and the
 9   answers of the witness were taken down by me in
10   shorthand and thereafter reduced to print by
11   computer-aided transcription under my direction; that
12   deposition review and signature was requested; that the
13   foregoing pages are a full, true, and accurate record of
14   all proceedings and testimony had upon the taking of
15   said deposition, all to the best of my skill and
16   ability.
17            I FURTHER CERTIFY that I am in no way related
18   to any of the parties hereto, nor am I in any way
19   interested in the outcome hereof.
20            DATED at Phoenix, Arizona, this 3rd day of
21   November, 2010.
22
23
                              JACQUELYN A. ALLEN, RPR
24                            Certified Reporter No. 50151
                              For the State of Arizona
25
```