Page 1

1                    UNITED STATES DISTRICT COURT

                     EASTERN DISTRICT OF MISSOURI

2                          EASTERN DIVISION

3

4    GWENNETTE WILSON,                    )

                                          )

5           Plaintiff,                    )

                                          )

6           vs.                           ) Cause No.

                                          ) 4:11-CV-00790

7    ST. CHARLES COUNTY,                  )

     DEPUTY MATT HOWZE, Individually      )

8    and as Deputy Sheriff of            )

     St. Charles County,                  )

9    and                                  )

     TASER INTERNATIONAL, INC.,           )

10                                         )

            Defendants.                    )

11

12

13

14        VIDEOTAPED DEPOSITION OF JERAMY D. THOM

15        TAKEN ON BEHALF OF THE PLAINTIFFS

16             DECEMBER 23, 2013

17

18

19

20     (Starting time of the deposition:  10:00 a.m.)

21

22

23

24

Page 8

1   for the record?

2             MR. WILLIAMSON:  Peter Williamson,

3   attorney on behalf of plaintiffs.

4             MR. DOHRMAN:  Greg Dohrman appearing on

5   behalf of the defendants St. Charles County and

6   Deputy Matthew Howze.

7             MR. BRAVE:  Michael Brave for defendant

8   TASER International, Incorporated.

9             MS. EILER:  Jessie Eiler for the

10  plaintiff Gwennette Wilson.

11            VIDEOGRAPHER:  If you could please

12  swear in the witness.

13            *    *    *    *    *

14               JERAMY D. THOM,

15  of lawful age, produced, sworn and examined on

16  behalf of the Plaintiffs, deposes and says:

17            *    *    *    *    *

18               EXAMINATION

19  QUESTIONS BY MR. WILLIAMSON:

20       Q.   Sir, would you please state your full

21  name for the record?

22       A.   Jeramy Drew Thom.

23       Q.   And how do you spell your last name?

24       A.   T-H-O-M.

JERAMY D. THOM  12/23/2013

Page 17

1   2009.

2          Q.    And therefore, as I understand it, you

3   were an active duty officer at the time of the

4   incident with Mr. Wilson; is that correct?

5          A.    Yes, sir.

6          Q.    Other than your involvement in training

7   Deputy Howze and perhaps in downloading the data

8   port of the X26 that he used during the incident,

9   did you have any other direct involvement in the

10  Wilson incident?

11         A.    No, sir.

12         Q.    Going back to your academy training,

13  did you have any education at all in the use of a

14  TASER electronic control device?

15         A.    Not at the academy, no.

16         Q.    When was the first time that you

17  received training regarding the operation and use of

18  a TASER electronic control device?

19         A.    I would have to give you an estimate on

20  that, sir.  Sometime in 2005 after I started with

21  the sheriff's department.

22         Q.    Do you recall what that training

23  consisted of in a general sense?

24         A.    It was an eight-hour training class

JERAMY D. THOM   12/23/2013

1   that consisted of a classroom portion with

2   PowerPoint -- PowerPoint presentation, and then a

3   hands-on portion that involved using the device and

4   a voluntary exposure to the device.

5        **Q.   Where did that class take place?**

6        A.   I'm sorry.  Did you say where or when?

7        **Q.   Where did it take place?**

8        A.   I don't recall, sir.

9        **Q.   Do you recall if you ever went to**

10  **Scottsdale, Arizona for any training regarding the**

11  **operation and use of an electronic control device?**

12       A.   Yes, sir.  I also went to a instructor

13  and armorer class in Scottsdale, Arizona.

14       **Q.   Do you have any recollection of when**

15  **you were certified as a TASER instructor?**

16       A.   I can't recall the exact time, sir.

17       **Q.   Let me ask you the same question about**

18  **the armorer class.  Do you recall when you received**

19  **that certification?**

20       A.   I don't recall, sir.

21       **Q.   Did you go to Scottsdale at the behest**

22  **of your department?**

23       A.   Yes, sir.

24       **Q.   Did they, in other words, ask you to go**

**JERAMY D. THOM   12/23/2013**

1    there?

2          A.   Yes, sir, they did.  Actually, I

3    volunteered to go, sir.

4          Q.   Do you know who your instructor was for

5    the instructor class in Scottsdale?

6          A.   I don't recall, sir.

7          Q.   Do you remember who the instructor was

8    for the armorer class?

9          A.   I do not recall, sir.

10         Q.   Do you recall whether it was a TASER

11   employee that was the instructor?

12         A.   I recall that all the instructors there

13   were TASER employees.

14         Q.   What about the initial class that you

15   took perhaps in 2005, do you recall who the

16   instructor was for your initial training?

17         A.   No, sir.

18         Q.   Do you recall whether it was an

19   employee of St. Charles County or an employee of

20   TASER International?

21         A.   I don't recall, sir.  It was not an

22   employee of St. Charles County.  It was -- it was an

23   outside instructor, either a instructor from another

24   department or from TASER themselves.

Page 22

1    approximately.  I also was a in-service instructor

2    for some of the different disciplines that we had to

3    retrain the officers in every year by policy.

4         **Q.   And I have the feeling that as part of**

5    **your role as an in -- in-service instructor one of**

6    **the things you taught -- one of the disciplines you**

7    **taught was the use of a TASER?**

8         A.   Yes, sir.

9         **Q.   What other disciplines did you teach?**

10        A.   I was also a OC instructor, the pepper

11   spray as it's commonly known.  I had just been given

12   a position as a firearms instructor.  Unfortunately,

13   I wasn't able to teach any classes.  I was given

14   that right before I left the department.  I was also

15   a PPCT instructor, which is the self-defense system

16   that's used by the sheriff's department.  That was

17   used at that time.

18        **Q.   Did the department require you to**

19   **become -- oh, strike that.**

20             **Did your department require that you**

21   **get an instructor's certification from TASER before**

22   **becoming an in-service instructor in the department?**

23        A.   Yes.

24        **Q.   Also require you to get the armorer**

Page 23

1    certification from TASER as well before becoming an

2    in-service instructor?

3        A.    They didn't require it.  I volunteered

4    to take that class so I'd have a better

5    understanding of the device.  They required

6    instructor development, though.

7        Q.    Now, do you have any idea as you sit

8    here today approximately when the St. Charles County

9    Sheriff's Department first purchased TASERs?

10       A.    I do not, no, sir.

11       Q.    Did anybody involved in the

12   decision-making process --

13       A.    No, sir.

14       Q.    -- regarding the purchase of TASER

15   electronic control devices?

16       A.    No, sir.

17       Q.    Do you recall when you first became

18   aware of the fact that TASERs were being implemented

19   by the St. Charles County Sheriff's Department?

20       A.    No, sir.  I would have to give you an

21   estimate.  Like I said, it would be somewhere within

22   the first year or two of my employment with the

23   sheriff's department.

24              We didn't have them when I started, and

Page 24

```
 1    I believe I was off of field training, which would
 2    have been the first three months, and I believe I
 3    was out of my first year on the road prior to them
 4    implementing the TASERs.
 5            Q.   I'm sorry.  We're -- we're getting a
 6    lot of static on the line when you're speaking.  I'm
 7    missing a couple of words here and there.  Did you
 8    say that you -- in-service training for
 9    approximately three months after you first were
10    hired; is that right?
11            A.   No, sir.  The first three months on the
12    road was my field -- my field training time.
13            Q.   Right.
14            A.   That was the first three months.  And
15    then you're on probation for the entire first year
16    when you're hired on to the sheriff's department.  I
17    accomplished both those portions prior to the TASERs
18    being deployed to the department.  So that it was
19    sometime after the first year just to give an
20    estimate.
21            Q.   Okay.  So that would have been at least
22    into 2006; is that correct?
23            A.   Roughly, yes, sir.
24            Q.   Do you recall how you were first
```

Page 25

1    **approached by your department with respect to being**

2    **the one to get the training for the TASER electronic**

3    **control device?**

4          A.   No, sir.

5          **Q.   Do you recall if -- if that was the**

6    **request that was made to you or you volunteered?**

7          A.   I don't recall specifically.  I can

8    recall generally that whenever there was an

9    instructor needed for a certain discipline at the

10   department it was generally posted, and also by word

11   of mouth at roll call, our roll call that was

12   conducted for the road deputies.

13             And it was, generally speaking, a

14   voluntary-type situation where if it was something

15   you were interested in, you would have put your name

16   in and request to be sent to training so that you

17   could be involved in that.

18             MR. WILLIAMSON:  I'm going to stop for

19   a second.  Is there a tech person available because

20   this is really -- the sound that I'm getting from

21   you is really bad and it makes things so impossible

22   to do this.

23             VIDEOGRAPHER:  We're going to go off

24   the record at approximately 10:24 a.m.

```
 1                    MR. BRAVE:  Objection, form.

 2                    MR. DOHRMAN:  Join.

 3           A.    I believe so, sir.

 4           Q.    (By Mr. Williamson)  Do you know

 5    deputy -- well, strike that.

 6                    Do you have a personal relationship

 7    with Deputy Matthew Howze?

 8           A.    No, sir.  Can you be more specific?

 9           Q.    Well, is he one of your buddies do you

10    hang out with when you're home, you know, go out and

11    have a beer or whatever?

12           A.    No.  I don't -- I don't know if I've

13    seen or spoken to him since I left the sheriff's

14    department.  If I did, it has been in passing.

15           Q.    Okay.  While you were on the

16    department, did you consider him to be one of your

17    friends, personal friends?

18           A.    Yes.

19           Q.    As you sit here today, do you have any

20    personal -- I'm sorry, do you have any specific

21    recollection of having trained Deputy Howze with

22    respect to the use of a TASER electronic control

23    device?

24           A.    Not specifically, no.  I know that he
```

Page 34

```
 1   was in my training class based on rosters and having

 2   trained all of the deputies at that time in the

 3   TASER.

 4        Q.   When you say all the deputies, do you

 5   mean all the deputies in the department?

 6        A.   Initially, yes, I was one of the lead

 7   instructors and was present -- I was present at all

 8   of the initial training classes for the deputies at

 9   that time.

10        Q.   Okay.  As part of the records that you

11   reviewed prior to today's deposition, did you have

12   occasion to review the training records of Deputy

13   Howze?

14        A.   Not the training records -- not his

15   training records, but I did review the test that was

16   administered to him, the written test that would

17   have been administered to him during those training

18   classes.

19        Q.   Looking at those tests, is it in any

20   way helpful to you in determining which particular

21   training version Deputy Howze was trained on?

22        A.   No, sir.

23        Q.   Now, to the best of your knowledge, did

24   St. Charles County draft any written training
```

JEREMY D. THOM  12/23/2013

Page 35

1    guidelines -- well, strike that.

2              Any training materials is what I mean,

3    in terms of training officers on how to use a TASER

4    electronic control device?

5         A.   In lieu of or in addition to what TASER

6    required us to -- to train.

7         Q.   Well, either one?

8         A.   I don't recall, sir.

9         Q.   Okay.  What materials did you use as

10   part of your training of the other deputies in the

11   St. Charles County Sheriff's Department with respect

12   to the use of the TASER?

13        A.   The -- the material that was provided

14   by TASER, we had a CD-ROM that was given to us by

15   the company that contained the current training

16   version, and then we also had to -- as an instructor

17   prior to training the class, we had a very finite

18   amount of time prior to the class that we had to go

19   on-line and get updates by the company, training

20   updates.

21             I don't recall what they were -- what

22   they were officially called, and then we would

23   utilize those in the class to ensure that we were

24   giving them the most up-to-date training.

Page 36

1          Q.   Okay.  Before we get specifically into

2     the training, I want to understand a little bit

3     about the protocol in the St. Charles County

4     Sheriff's Department, if you know it.  I want to

5     start by asking you with respect to any bulletins

6     that might be issued by TASER International, do you

7     know how that information was disseminated within

8     the department?

9          A.   I know personally as a TASER training

10    instructor, at that time I would personally look for

11    going on -- like I said, go on-line and look for

12    updates, and then whatever was pertinent, whatever

13    was an update from the last time that we met with

14    the -- with the deputies for training, we would

15    disseminate that information to the deputies,

16    include -- including that in the training.

17         Q.   When you personally went on-line to

18    look for any updated materials, did you review the

19    updated warnings that were issued by TASER?

20         A.   Anything that was given to me by TASER

21    I checked on.

22         Q.   Okay.  I'm sorry.  I'm a little

23    confused.  When you say any materials that were

24    given to you by TASER, you mean given to you based

Page 37

1   on what was on-line or things you actually received

2   from them?

3          A.   Yes, sir.  I'm sorry.  Let me clarify

4   that.  Anything that I -- when I went on-line to

5   check for the -- the updates, I don't remember if I

6   actively had to check or if they were e-mailed to us

7   as soon as they came out, but we would get

8   information from the company that showed any new

9   training updates that needed to be implemented and

10  dispersed to the deputies that we were training.

11         Q.   And when you say "training," are you

12  also including any bulletins and warnings that might

13  have been issued by TASER?

14         A.   Yes, sir.

15         Q.   Okay.  Was there an officer designated

16  in the department who was the overall person in

17  charge of the TASER program?

18         A.   Yes, sir.

19         Q.   Who was that?

20         A.   That was me at that time, sir.

21         Q.   Do you recall ever receiving in the

22  mail any written materials from TASER International,

23  and I'm talking about the period of, you know,

24  between -- well, let's say around 2006 when you

JERAMY D. THOM  12/23/2013

1   **first got involved in this.**

2                   **Were you receiving any written**

3   **materials, in other words new warnings or bulletins**

4   **that might be issued in written form that were**

5   **mailed to you directly?**

6           A.   I don't recall how I obtained the

7   information.  If it -- I don't recall if it was sent

8   to me directly.  It would have been sent to the

9   department, attention me, not necessarily to my

10  house if that's what you're asking, and at that time

11  I think they were still sending out CD-ROMs and the

12  updates were given electronically either through

13  e-mail or through the website.  I don't recall

14  specifically, though, sir.

15          **Q.   Okay.  But you recall specifically**

16  **receiving updated training on CD-ROMs?**

17          A.   Yes, sir.

18          **Q.   And do you remember, you know, as a**

19  **practical matter how those CD-ROMs made their way to**

20  **you?  In other words, did they come to the**

21  **department, somebody in the department hand that to**

22  **you, or how did that work?**

23          A.   I believe they were sent to me through

24  the department from TASER.

Page 39

1          Q.   Okay.  And once you got those CD-ROMs

2    with updated training materials, what -- what would

3    you then do with the CD-ROM?

4          A.   Personally, I kept a small CD-ROM case

5    that had all my training, PowerPoint presentations

6    in that I kept up-to-date.  I took the old ones and

7    destroyed them, the out-of-date ones and destroyed

8    them.

9          Q.   Okay.  Did you personally draft any

10   training materials to be used as part of your

11   training of the other deputies in the St. Charles

12   County Sheriff's Department with respect to the

13   operation and use of TASER electronic control

14   devices?

15         A.   I don't recall.

16         Q.   Okay.  If such materials existed, where

17   would they be kept?

18         A.   Can you -- can you reword that

19   question?  I'm not clear on what you're asking.

20         Q.   Sure.  You said you couldn't recall

21   whether you personally drafted any training

22   materials to be used in your classes, and I'm

23   wondering if such materials existed, where would

24   they be kept within the St. Charles County Sheriff's

Page 43

```
 1   determined to classify TASERs as non-lethal weapons?

 2        A.   I don't recall.

 3        Q.   Do you know if you were involved in

 4   that decision-making at all?

 5        A.   I don't recall, sir.

 6        Q.   As you sit here today, can you tell me

 7   what your understanding of the definition of a

 8   non-lethal weapon was or is?

 9             MR. BRAVE:  Objection, form.

10        A.   A non-lethal weapon is something that

11   is not likely to cause death or serious bodily

12   injury.

13        Q.   (By Mr. Williamson)  Okay.  When you

14   say "not likely," can you be a little more specific

15   as to what you mean?

16        A.   It's not -- no, sir.  It's not likely.

17        Q.   Does likely -- let's do zero chance or

18   some infinitesimal chance?

19             MR. BRAVE:  Objection, form.

20             MR. DOHRMAN:  Join.

21        A.   I'm not sure I can -- I can make that

22   determination, sir.

23        Q.   (By Mr. Williamson)  Okay.  When you

24   were instructing deputies with respect to the use of
```

Page 44

1      a TASER electronic control device, were you

2      instructing them that TASERs were a non-lethal

3      weapon?

4                   MR. BRAVE:  Objection, form.

5             A.   Yes, sir.

6             Q.   (By Mr. Williamson)  Okay.  And was

7      that based on your own understanding that TASERs

8      were not likely to cause death?

9                   MR. BRAVE:  Objection, form.

10            A.   Yes, sir.

11            Q.   (By Mr. Williamson)  When you initially

12     received your training regarding TASER electronic

13     control devices, were you aware that deaths had

14     occurred that were associated with the use of a

15     TASER?

16                  MR. BRAVE:  Objection, form.

17            A.   Can you reword that question, sir?

18            Q.   (By Mr. Williamson)  Sure.  I'm going

19     back to your -- when you were initially trained

20     regarding the use of a TASER electronic control

21     device.  Did you receive any information that TASERs

22     had been linked or associated with deaths?

23                  MR. BRAVE:  Objection, form.

24            A.   I don't recall.

JERAMY D. THOM  12/23/2013

Page 46

1        A.    I have never been given that

2    information.  I'm not involved with TASER anymore,

3    so ...

4        Q.    (By Mr. Williamson)  But at any

5    time that you were, were you given any such

6    information?

7              MR. BRAVE:  Objection, form.

8        A.    I don't recall.

9        Q.    (By Mr. Williamson)  Tell me, if you

10   could, what initial training that you gave officers?

11   In other words, the basic user course -- well, let

12   me rephrase that.  I'm sorry.

13              Let's talk about the basic

14   certification course in your department for use of a

15   TASER electronic control device.  What did that

16   consist of?

17              MR. BRAVE:  Objection, form.

18       A.    Generally speaking it involved the --

19   the device itself, how it operated, the

20   nomenclature.  At what point during -- or where it

21   fell in the non-lethal weapons category.

22              How to deal with the subject after the

23   deployment, and collection of evidence in -- in any

24   kind of circumstance that -- that they might have to

Page 47

```
 1   collect -- collect up the device.
 2         Q.   (By Mr. Williamson)  Okay.  Let's talk
 3   first about the length of the course.  How long was
 4   the basic user course that you gave to other
 5   deputies in the department?
 6              MR. BRAVE:  Objection, form.
 7         A.   The basic initial course for first time
 8   user I believe was eight hours of training -- of
 9   training time.  Eight hours of classroom combined
10   with training time.
11         Q.   (By Mr. Williamson)  Can you break the
12   eight hours down into how much was spent in the
13   classroom and how much was spent handling the
14   device?
15              MR. BRAVE:  Objection, form.
16         A.   Not specifically, no, sir.
17         Q.   (By Mr. Williamson)  So you can't give
18   me any estimate like half was spent in the
19   classroom, half was dealing with the device itself,
20   operating it, showing its use, things of that
21   nature?
22              MR. BRAVE:  Objection, form.
23         A.   No, sir, I do not remember that far
24   back, that specific of a detail.
```

Page 48

1          Q.    (By Mr. Williamson)  Let's talk about

2    then specifically the classroom portion of the

3    training.  What did that consist of?

4               MR. BRAVE:  Objection, form.

5          A.    PowerPoint presentation.

6          Q.    (By Mr. Williamson)  Did you use the

7    PowerPoint presentation that came directly from the

8    TASER CD-ROM?

9               MR. BRAVE:  Objection, form.

10         A.    As I recall, yes, sir.

11         Q.    (By Mr. Williamson)  And would you

12   physically show that PowerPoint to the deputies that

13   were in the class for TASER training?

14              MR. BRAVE:  Objection, form.

15         A.    Yes, sir.

16         Q.    (By Mr. Williamson)  At the end of the

17   classroom portion of the instruction, did you

18   require that the deputies take a test?

19         A.    Yes, sir.

20              MR. BRAVE:  Objection, form.

21         Q.    (By Mr. Williamson)  Was the test

22   something that you also obtained from the TASER

23   CD-ROM?

24              MR. BRAVE:  Objection, form.

```
1              MR. BRAVE:  Objection, form.

2              MR. DOHRMAN:  Join.

3         A.   Generally I remember that it was more

4    about what not to target, and that was the head,

5    neck, and groin area.

6         Q.   (By Mr. Williamson)  Okay.  And every

7    other portion of the body was fair game for

8    targeting?

9              MR. BRAVE:  Objection, form.

10        A.   I don't recall specifically.

11        Q.   (By Mr. Williamson)  Do you recall

12   whether at any time during the course of your

13   employment at St. Charles County Sheriff's

14   Department as a TASER instructor that you received

15   any information to change the targeting zone?

16        A.   No, sir, I don't recall.

17        Q.   So as far as you can recall as you sit

18   here today, the targeting zone that was suggested by

19   TASER International remained the same throughout the

20   entire time that you were a TASER instructor?

21             MR. BRAVE:  Objection, form.

22        A.   Yes, as I recall.

23        Q.   (By Mr. Williamson)  Let me -- let me

24   go back for a second.
```

Page 51

```
 1              Do you know whether St. Charles County

 2   ever hired any expert to evaluate the safety claims

 3   that were being made by TASER International with

 4   respect to its electronic control device?

 5              MR. BRAVE:  Objection, form.

 6        A.   I don't recall.

 7        Q.   (By Mr. Williamson)  Do you recall ever

 8   having any meetings with anyone in which the subject

 9   of the safety claims made by TASER were discussed?

10              MR. BRAVE:  Objection, form.

11              MR. DOHRMAN:  Join.

12        A.   No.

13        Q.   (By Mr. Williamson)  So as we sit here

14   today, I gather you don't -- you can't recall

15   whether TASER -- I'm sorry, you can't recall whether

16   St. Charles County ever independently evaluated the

17   safety claims made by TASER International; is that a

18   fair statement?

19              MR. BRAVE:  Objection, form.

20        A.   I couldn't say whether they did or

21   didn't.

22        Q.   (By Mr. Williamson)  Do you know at the

23   time that you were employed by St. Charles County

24   Sheriff's Department whether the St. Charles County
```

Page 52

1    Sheriff's Department employed a medical or science

2    expert to look at -- to look at or evaluate the

3    safety claims made by TASER International?

4              MR. BRAVE:  Objection, form.

5              MR. DOHRMAN:  Join.

6         A.   I don't know, sir.

7         Q.   (By Mr. Williamson)  Did you yourself

8    do any investigation whatsoever to evaluate the

9    safety claims being made by TASER International?

10             MR. BRAVE:  Objection, form.

11             MR. DOHRMAN:  Join.

12        A.   Just read over the information that was

13   given to me by the company.

14        Q.   (By Mr. Williamson)  So you relied on

15   what information was given to you by TASER

16   International; is that correct?

17             MR. BRAVE:  Objection, form.

18        A.   Yes, sir.

19        Q.   (By Mr. Williamson)  So in other words,

20   if TASER International said that the weapon was

21   non-lethal, you -- you trusted that information that

22   was provided to you by them?

23             MR. BRAVE:  Objection to form.

24        A.   The information that was provided were

Page 64

```
 1          Q.    (By Mr. Williamson)  Okay.  Do you

 2   recall when you were being trained initially in the

 3   use of the TASER electronic control device that you

 4   should target center body mass?

 5          A.    I -- I believe it was termed center

 6   mass, yes, sir.

 7          Q.    Okay.  Center mass.  And that's

 8   consistent with the training you received in the use

 9   of firearms, correct?

10                MR. BRAVE:  Objection, form.

11          A.    At different times, yes, sir.  I've

12   been trained different ways over the years.

13          Q.    (By Mr. Williamson)  Okay.  But one of

14   the ways -- hold on just a second.  I lost your

15   picture here.

16          A.    Okay.

17          Q.    There we go.  One of the ways that

18   you've been trained with respect to the use of

19   firearms is to target center mass, correct?

20          A.    Yes, sir.

21          Q.    And why is that?  Is there a reason for

22   that?

23          A.    Highest probability of a successful

24   hit, sir.
```

Page 65

1          Q.    Okay.  And do you recall being trained

2    initially in the use of the TASER electronic device

3    that one of the features of the use of the TASER was

4    that it was meant to target similar to a firearm?

5          A.    Yes, sir.

6          Q.    Are you familiar with the term "muscle

7    memory"?

8          A.    Yes, sir.

9          Q.    And are police officers trained --

10   let's talk about firearms for a moment.  They're

11   trained in such a way that when they fire, muscle --

12   muscle memory kicks in and they target center mass;

13   is that -- would you agree with that?

14               MR. BRAVE:  Objection, form.

15         A.    You'd have to ask that a little clear

16   -- little more clearly, sir.  I'm missing -- I'm not

17   understanding what you're asking.

18         Q.    (By Mr. Williamson)  Okay.  Well, as

19   part of firearms training, wouldn't it be fair to

20   say that you want to rely on muscle memory?

21               MR. BRAVE:  Objection.

22         Q.    (By Mr. Williamson)  In other words,

23   you don't want to have that much time to think about

24   when you're firing.  You want to pull your weapon,

1    and if you're going to fire, fire, and you're going

2    to aim at center mass.  Isn't that right?

3            MR. BRAVE:  Objection, form.

4        A.   Yes, for the highest probability of a

5    hit.

6        Q.   (By Mr. Williamson)  Right.  And muscle

7    memory is important when you use a firearm, correct?

8            MR. BRAVE:  Objection, form.

9        A.   Yes.

10       Q.   (By Mr. Williamson)  Okay.  And it's

11   also important when you're -- when you're targeting

12   a -- someone with a TASER; isn't that right?

13       A.   I'm not sure it completely translates

14   over to less lethal weapons.

15       Q.   Okay.  But at least with respect to

16   targeting, targeting was taught in the same way that

17   a firearm would be, to aim at center mass, right?

18       A.   I believe so, yes, sir.

19       Q.   Okay.  Let's go on to Bates stamp

20   number 32 which is entitled, "TASER Technology

21   Medical Safety."  Do you see that document?

22       A.   Yes, sir, I have it.

23       Q.   Have you had a chance to look through

24   these by the way?

Page 73

1         A.   I personally would agree with

2    everything except for the "critical stress amnesia."

3    I never personally witnessed that, sir.

4         **Q.   (By Mr. Williamson)   Okay.   Were these**

5    **the effects that you were -- that you were teaching**

6    **other deputies in your department regarding the**

7    **effects of the electronic control device?**

8              MR. BRAVE:   Objection, form.

9         A.   I was basing -- I was teaching them

10   based off this slide, so yes, sir.

11        **Q.   (By Mr. Williamson)   Okay.   Did you add**

12   **-- as part of your training to other deputies, did**

13   **you add any other effects of electronic control**

14   **devices that might not be listed on this particular**

15   **slide 33?**

16             MR. BRAVE:   Objection, form.

17        A.   I don't recall.

18        **Q.   (By Mr. Williamson)   Okay.   Can you**

19   **recall any other effects that you might have had**

20   **that aren't listed on slide 33?**

21        A.   I can't recall, sir.

22        **Q.   I want you to move on to slide -- Bates**

23   **stamp number 34 entitled, "Medical Safety:   Drugs."**

24   **Do you see that?**

**JERAMY D. THOM  12/23/2013**

1          A.   Yes, sir, I have it here.

2          **Q.   Okay.  Now, can you read the first**

3    **slide?**

4          A.   All three bullet points, sir?

5          **Q.   Well, just read the first one and then**

6    **I'll ask you some questions about that.**

7          A.   Okay.  "The ADVANCED TASER M26 was

8    applied directly to the chest of experimental

9    animals without causing heart failure during tests

10   at the University of Missouri."

11         **Q.   Okay.  Do you recall if this might have**

12   **been one of the studies that you reviewed?**

13         A.   There were a lot of studies that we

14   went over.  I don't recall, sir.

15         **Q.   Okay.  Did you find this particular**

16   **bullet point relevant to your teaching of your**

17   **fellow deputies regarding the use of an X26 since**

18   **this obviously refers to a different device?**

19         A.   I -- I viewed everything in this -- in

20   these slides relevant to teaching the deputies to

21   operate the X26.

22         **Q.   Okay.  Did you understand there was a**

23   **difference between the M26 and the X26?**

24         A.   Yes.

Page 76

1    but let me just ask the questions anyway.  With

2    respect to this first bullet point, do you know

3    where in the chest areas that the X26 was applied in

4    this experimental test?

5              A.   No, sir.

6              Q.   And do you know what the duration of

7    the discharges were?

8              A.   No, sir.

9              Q.   Okay.  What -- what does heart failure

10   mean to you?

11             A.   The heart stops working as it was

12   designed to do.

13             Q.   Okay.  Now, having read this particular

14   bullet point, did you believe and did you -- well,

15   first of all, do you believe that the M26 could not

16   affect the heart, the -- the electrical current of

17   the M26?

18             A.   Did -- did I believe?  At that time

19   when I was training, when I was teaching this, I

20   don't recall what I -- how I viewed it, sir.

21             Q.   Okay.  Well, what do you recall

22   teaching your fellow deputies about whether the M26

23   could affect the heart?

24             A.   I went bullet point -- bullet point by

Page 77

1    bullet point, sir.  I don't remember any -- any

2    deviation from that, sir.

3            Q.    So if I gather from what you just said,

4    you didn't provide any further commentary with

5    respect to these bullet points.  You basically just

6    reviewed them with the deputies you were training?

7            A.    Yes, sir.

8            Q.    Now, let's go down to bullet point

9    number two.  Could you read that, please?

10           A.    "Using 'worst case' scenarios, cardiac

11   safety experts found no induction by the M26 weapon

12   of abnormal heart rhythms."

13           Q.    Okay.  Did you have any definition of

14   what worst case meant?

15           A.    No, sir.

16           Q.    Were you ever provided with that

17   definition by any source or any person?

18           A.    I don't recall.

19           Q.    Okay.  So you're -- you're training

20   other deputies relying on this PowerPoint, and I

21   gathered you didn't know what worst case meant?

22           A.    No.  I don't recall what I was given as

23   far as worst case scenario.  I very well could have

24   been in the numerous studies that we went over when

Page 83

1          Q.   Look at -- I want you to look at the

2     first major paragraph on this page under "WARNINGS

3     AND RISKS."  Do you see that?

4          A.   Yes, sir.

5          Q.   Could you read the first sentence,

6     please?

7          A.   "The TASER devices are non-lethal

8     devices."

9          Q.   Okay.  In reading that, did you

10    personally conclude that there was very little risk

11    of injury as a result of being subjected to a

12    voluntary exposure?

13         A.   Yes.

14              MR. BRAVE:  Objection, form.

15         Q.   (By Mr. Williamson)  And is that

16    something you taught your students?

17         A.   I didn't have to teach my students the

18    definition of a non-lethal device if that's what

19    you're asking.

20         Q.   Okay.  But what I'm asking you is did

21    you instruct your students that when they were

22    signing this release that the device was non-lethal?

23         A.   Yes.

24         Q.   I want you to go down to -- let me see

Page 99

```
 1          A.   Besides my supplemental report that I

 2   filed?

 3          Q.   Right.

 4          A.   No, nothing in addition to that.  No,

 5   sir.

 6          Q.   Okay.  Let's move on to Exhibit 1 --

 7   I'm sorry, Exhibit 2, slide 66?

 8          A.   That same -- same packet, correct, sir?

 9          Q.   Yes.

10          A.   Okay.

11          Q.   This slide is entitled, "Probe

12   Trajectory."  Do you see that?

13          A.   Yes, sir.

14          Q.   Okay.  Would you read bullet point

15   number one, please?

16          A.   "Aim like a standard firearm at center

17   of mass."

18          Q.   And that was what you were teaching

19   your fellow deputies with respect to targeting,

20   correct?

21          A.   Yes, sir.

22          Q.   And this slide would you agree

23   illustrates the -- the spread pattern that exists

24   when probes are fired from an X26?
```

Page 100

1          A.   Yes, sir.

2          Q.   **Take a look at the next page, which is**

3    **slide 80, Exhibit 2.**

4          A.   Yes, sir.

5          Q.   **This is entitled, "Aim."  Do you see**

6    **that?**

7          A.   Yes, sir.

8          Q.   **And again, do these look familiar to**

9    **you, that these are the slides that you used as part**

10   **of your training of other deputies --**

11              MR. BRAVE:  Objection, form.

12         Q.   **-- at the St. Charles County Sheriff's**

13   **Department?**

14              MR. BRAVE:  Objection, form.

15              MR. DOHRMAN:  Join.

16         A.   Again, generally they look familiar,

17   yes, sir.

18         Q.   **(By Mr. Williamson)  They are not --**

19   **let me ask you this.  Anything that we've gone over**

20   **so far, has it been inconsistent with your**

21   **understanding of what you taught your fellow**

22   **deputies?**

23              MR. BRAVE:  Objection, form.

24              MR. DOHRMAN:  Objection -- join.

JERAMY D. THOM   12/23/2013

Page 101

```
 1          A.   No, sir.

 2          Q.   (By Mr. Williamson)   Read the first

 3   bullet point, please.

 4          A.   "Aim at target:  Center of mass or

 5   legs."

 6          Q.   Okay.  And again, do you believe this

 7   is what you taught your fellow deputies?

 8               MR. BRAVE:  Objection, form.

 9          A.   Yes, sir.

10          Q.   (By Mr. Williamson)   Okay.  And this

11   continues to be consistent with the idea of

12   targeting center mass, correct?

13               MR. BRAVE:  Objection, form.

14          A.   Yes.

15          Q.   (By Mr. Williamson)   Okay.  Go on to

16   Exhibit Number 2, slide 82.

17          A.   Yes, sir.

18          Q.   Does this slide look familiar to you?

19          A.   Yes, sir.

20          Q.   And this slide is entitled, "Effective

21   Targeting Zones"?

22          A.   Yes, sir.

23          Q.   What's -- what's your understanding of

24   what this illustration represents?
```

Page 117

1    with this particular slide 31, if I understand your

2    testimony correctly, you would have gone back and

3    looked at all the TASER warnings contained in the

4    instructor manual, correct?

5          A.   The updated ones provided by TASER,

6    yes.

7          Q.   Okay.  And had there been a warning, an

8    updated warning in the instructor manual regarding

9    cardiac risk, you would have imparted that to your

10   fellow deputies when you taught them, correct?

11         A.   Yes, sir.

12         Q.   Okay.  Take a look at slide 66.  This

13   again is I think exactly the same as the slides

14   previously in version 12.  Actually, the first slide

15   is 66.  Actually, I'm sorry, there is one

16   difference, and that is a reference to 15-, 21-, and

17   25-foot cartridges.

18         A.   Yes, sir.

19         Q.   Okay.  Now, the first bullet point says

20   what?

21         A.   "Aim like a standard firearm at center

22   of mass."

23         Q.   And that again repeats and is

24   consistent with what we talked about previously,

Page 118

1    that you were training your deputies to fire at

2    center of mass, correct?

3           A.   Yes, sir.

4           Q.   Okay.  Take a look at slide 70, which

5    again I think is identical to slide 80 in the

6    previous version.  Actually, I see one difference,

7    and that is a reference to the XP35.

8           A.   35.

9           Q.   But in any event, could you read bullet

10   point number one?

11          A.   Give me one second, sir.  Bullet point

12   one is, "Aim at target:  Center of mass or legs."

13          Q.   And again, this is for reinforcement

14   for the idea that you are to target center mass when

15   aiming the device, correct?

16          A.   Yes, sir.

17          Q.   Okay.  And take a look at the next

18   slide.  We'll go through these a little bit more

19   quickly since we've already reviewed them and

20   they're just repetitive of previous versions.

21          A.   Yes, sir.

22          Q.   Take a look at slide 74.

23          A.   Yes, sir.  I have it.

24          Q.   Okay.  And this is -- do we agree,

JERAMY D. THOM  12/23/2013

Page 207

1                 CERTIFICATE OF REPORTER

2    STATE OF MISSOURI   )

                         ) ss.

3    CITY OF ST. LOUIS   )

4                 I, William L. DeVries, a Certified

5    Court Reporter (MO), Certified Shorthand Reporter

6    (IL), Registered Diplomate Reporter, Certified

7    Realtime Reporter, and a Notary Public within and

8    for the State of Missouri, do hereby certify that

9    the witness whose testimony appears in the foregoing

10   deposition was duly sworn by me; that the testimony

11   of said witness was taken by me to the best of my

12   ability and thereafter reduced to typewriting under

13   my direction; that I am neither counsel for, related

14   to, nor employed by any of the parties to the action

15   in which this deposition was taken, and further that

16   I am not a relative or employee of any attorney or

17   counsel employed by the parties thereto, nor

18   financially or otherwise interested in the outcome

19   of the action.

20

21                   _____

22                   Notary Public within and for

23                   The State of Missouri

24